USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 96-1052 UNITED STATES OF AMERICA, Appellee, v. FRANK P. BONGIORNO, Defendant, Appellant. _________________________ No. 96-1560 UNITED STATES OF AMERICA, Plaintiff, Appellee, v. FRANK P. BONGIORNO, Defendant, Appellant. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ _________________________ Thomas V. Silvia for appellant. ________________ Jeanne M. Kempthorne and Christopher Alberto, Assistant _____________________ ____________________ United States Attorneys, with whom Donald K. Stern, United States _______________ Attorney, was on brief, for appellee. _________________________ February 7, 1997 _________________________ SELYA, Circuit Judge. In many respects the history of SELYA, Circuit Judge. _____________ this litigation resembles a Greek tragedy, excerpts of which from time to time have occupied the attention of no fewer than ten federal and state judges across the nation. This particular passage revolves around the constitutionality of the Child Support Recovery Act (CSRA), 18 U.S.C. 228 (1994), and the federal government's authority, if any, to collect restitutionary payments ordered under the CSRA by recourse to the Federal Debt Collection Procedure Act (FDCPA), 28 U.S.C. 3001-3308 (1994). The CSRA issue is new to us and the FDCPA issue has not, to our knowledge, been addressed by any court of appeals. After sorting through these and other arcana, we reject the defendant's challenge to his criminal conviction and sentence, holding, among other things, that Congress did not exceed the bounds of its constitutional power in enacting the CSRA. Turning to post- conviction events, we hold that the federal government lacks authority to proceed against a "deadbeat dad" by using the FDCPA as an instrument for enforcing a restitutionary order issued in connection with an antecedent criminal conviction. I. SETTING THE STAGE I. SETTING THE STAGE In October 1990 a Georgia state court entered a decree ending Sandra Taylor's marriage to defendant-appellant Frank P. Bongiorno, granting Taylor custody of the couple's minor daughter, and directing Bongiorno (a physician specializing in bariatric surgery) to pay $5,000 per month in child support. Shortly thereafter, mother and daughter repaired to 2 Massachusetts. When Bongiorno subsequently sought to modify the child support award, Taylor counterclaimed on the ground that Bongiorno had failed to make the payments stipulated in the original decree. In September 1992 the Georgia court found Bongiorno in contempt for failing to pay upward of $75,000 in mandated child support and directed that he be incarcerated until he had purged the contempt. Bongiorno avoided immurement only because he had accepted a position in Michigan and the contempt order did not operate extraterritorially. Once in Michigan, Bongiorno made sporadic payments of child support despite the fact that his new post paid $200,000 per year. In March 1993 a Michigan state court domesticated the Georgia support order and authorized garnishment of Bongiorno's wages to satisfy the accumulated arrearage. Soon thereafter, Bongiorno quit his job and paid only $500 a month in child support from June to December 1993. In early 1994 Bongiorno went to work for the State of Michigan. That May a Michigan state court issued an order enforcing the Georgia support award to the extent of $300 per week.1 Bongiorno failed to satisfy even this modest impost. Approximately one year later the federal behemoth stirred; the United States charged Bongiorno with violating the  ____________________ 1Differences in state law explain this ceiling. The Michigan court applied Michigan's child support guidelines, Mich. Comp. Laws 552.519 (1988), to determine a current support obligation and then added a premium to be applied against Bongiorno's accumulated arrearages. Neither the propriety of the ceiling nor the Michigan court's treatment of the Georgia court's decree is at issue here. 3 CSRA. Because Bongiorno's minor daughter has resided continuously in Massachusetts from 1990 forward (albeit with her grandmother for much of that time), the government preferred charges in that district. Bongiorno moved unsuccessfully to dismiss the indictment on the ground that the CSRA represents an unconstitutional exercise of Congress' power under the Commerce Clause. At an ensuing bench trial, the district court determined that Bongiorno had possessed the ability to pay $5,000 monthly in the 1992-1993 time frame, but that he had chosen not to do so. Consequently, the court found Bongiorno guilty of willful failure to pay child support and sentenced him to five years of probation. As a condition of probation, the court imposed a work-release arrangement, directing Bongiorno to spend up to twelve hours per day in the custody of the Bureau of Prisons for the first year of his probation. As a further condition, the court ordered restitution in the sum of $220,000 (a figure approximating the total arrearage then outstanding). Not content with its apparent victory, the government commenced a civil proceeding under the FDCPA as a means of enforcing the restitutionary order. After some procedural wrangling, the court granted the government's motion to attach Bongiorno's wages and disburse the proceeds. Bongiorno filed timely appeals in both cases, and we heard the appeals in tandem. We now affirm the conviction and sentence in the criminal case, but reverse the judgment in the civil case. 4 II. THE CONSTITUTIONALITY OF THE CHILD SUPPORT RECOVERY ACT II. THE CONSTITUTIONALITY OF THE CHILD SUPPORT RECOVERY ACT Bongiorno challenges his conviction principally on the ground that the CSRA is an unconstitutional exercise of Congress' authority under the Commerce Clause. We review de novo constitutional challenges to federal statutes. See United States ___ _____________ v. Gifford, 17 F.3d 462, 471-72 (1st Cir. 1994). _______ A. The CSRA and Its Prologue. A. The CSRA and Its Prologue. _________________________ In 1992 Congress focused on the importance of financial support from non-custodial parents as a means of combatting the growing poverty of single-parent families. The House Judiciary Committee observed that of $16.3 billion in child support payments due in 1989, only $11.2 billion was paid, leaving a shortfall of approximately $5 billion to be offset largely through government assistance. See H.R. Rep. No. 102-771, at 5 ___ (1992). The Committee concluded that "the annual deficit in child support payments remains unacceptably high," especially "in interstate collection cases, where enforcement of support is particularly difficult." Id. To illustrate this point, the ___ Committee noted that one-third of all uncollected child support obligations involved non-custodial fathers living out of state and that roughly fifty-seven percent of the custodial parents in such situations received support payments "occasionally, seldom or never." Id. ___ Because Congress doubted the states' ability efficaciously to enforce support orders beyond their own borders, see id. at 6 (recognizing that "interstate extradition and ___ ___ 5 enforcement in fact remains a tedious, cumbersome and slow method of collection"), it devised a federal solution hoping that the new law the CSRA would prevent delinquent parents from "mak[ing] a mockery of State law by fleeing across State lines to avoid enforcement actions by State courts and child support agencies." 138 Cong. Rec. H7324, H7326 (daily ed. Aug. 4, 1992) (statement of Rep. Hyde). In final form the statute makes willful failure "to pay a past due support obligation with respect to a child who resides in another State" a federal crime. 18 U.S.C. 228(a). A "past due support obligation" is an amount determined under a state court order that either has remained unpaid for more than one year or is greater than $5,000. See id. ___ ___ 228(d)(1). The law subjects violators to a panoply of punishments, including imprisonment, fines, and restitution. See ___ id. 228(b) & (c). ___ B. The Commerce Clause. B. The Commerce Clause. ___________________ The Commerce Clause bestows upon Congress the power, inter alia, to "regulate Commerce . . . among the several _____ ____ States." U.S. Const., art. I, 8, cl. 3. The appellant claims that the CSRA which in his case has the effect of regulating the nonpayment of Georgia-imposed child support obligations owed by a Michigan resident to a child domiciled in Massachusetts2  does not fall within the ambit of this constitutional grant. The  ____________________ 2Technically, child support is owed to the custodial parent for the benefit of the minor child. For simplicity's sake, however, we choose to reduce the triangle to a straight line and treat the obligation as if it were owed directly to the minor. 6 Supreme Court has identified three general categories of activity that lawfully can be regulated under the Commerce Clause: (1) activities that involve use of the channels of interstate commerce, (2) activities that implicate the instrumentalities of interstate commerce (including persons or things in interstate commerce), and (3) activities that have a substantial relation to, or substantially affect, interstate commerce. See United ___ ______ States v. Lopez, 115 S. Ct. 1624, 1629-30 (1995); Perez v. United ______ _____ _____ ______ States, 402 U.S. 146, 150 (1971). ______ While the CSRA is likely supportable under more than one of these rubrics, we believe that its validity is most easily demonstrated in terms of the second class of activities. In other words, because paying court-ordered child support occurs in interstate commerce when the obligated parent and the dependent child reside in different states, the underlying support obligation is subject to regulation under the Commerce Clause. Accord United States v. Hampshire, 95 F.3d 999, 1003 (10th Cir. ______ _____________ _________ 1996) (holding that the CSRA regulates a "court-ordered obligation to pay money in interstate commerce"), cert. denied, _____ ______ ___ S. Ct. ___ (1997); United States v. Mussari, 95 F.3d 787, 790 _____________ _______ (9th Cir. 1996) (concluding that the support obligation is a "thing" in interstate commerce because it must be met "by a payment that will normally move in interstate commerce by mail, by wire, or by the electronic transfer of funds"); United States _____________ v. Sage, 92 F.3d 101, 106 (2d Cir. 1996) (similar to Hampshire), ____ _________ cert. denied, ___ S. Ct. ___ (1997). _____ ______ 7 The appellant employs various artifices in attempting to resist the force of this conclusion. For starters, he protests that the obligation to pay child support is not "commerce" in any meaningful sense. That cry is drowned out by the broadcast definitions of the term used by the Supreme Court from the early days of the Republic, see, e.g., Gibbons v. Ogden, ___ ____ _______ _____ 22 U.S. (9 Wheat.) 1, 189-96 (1824), as refreshed by more recent Supreme Court jurisprudence, see, e.g., Heart of Atlanta Motel, ___ ____ ________________________ Inc. v. United States, 379 U.S. 241, 253-58 (1964). The term ____ ______________ "commerce" in the Commerce Clause context is a term of art, and the Court consistently has interpreted it to include transactions that might strike lay persons as "noncommercial." See, e.g., ___ ____ United States v. Simpson, 252 U.S. 465, 466 (1920) (defining ______________ _______ commerce to include transporting whiskey intended for the transporter's personal consumption); Lottery Case (Champion v. ____________ ________ Ames), 188 U.S. 321, 354 (1903) (defining commerce to include ____ carrying lottery tickets). The appellant is likewise fishing in an empty pond when he baldly proclaims that a support obligation is an intangible and therefore not a "thing" in interstate commerce. The Court has long read the Commerce Clause to reach transactions concerning intangibles. See, e.g., United States v. South- ___ ____ ______________ ______ Eastern Underwriters Ass'n, 322 U.S. 533, 549-50 (1944) (holding __________________________ that transactions may constitute commerce although they do not "concern the flow of anything more tangible than electrons and information"); Pensacola Tel. Co. v. Western Union Tel. Co., 96 ___________________ _______________________ 8 U.S. (6 Otto) 1, 11 (1877) (defining interstate commerce to include the transmission of intelligence over interstate telegraph lines). As the Court explained in United States v. _____________ Shubert, 348 U.S. 222 (1955), commerce exists where there is a _______ "continuous and indivisible stream of intercourse among the states" involving the transmission of money and communications. Id. at 226 (quoting South-Eastern Underwriters, 322 U.S. at 541). ___ __________________________ This definition fits the economic realities incident to child support orders involving a parent in one state and a child in another. Because compliance with such support orders requires the regular movement of money and communications across state lines, such transactions fall within the scope of permissibly regulated intercourse. See Hampshire, 95 F.3d at 1003; see ___ _________ ___ generally Comment, Making Parents Pay: Interstate Child Support _________ ______________________________________________ Enforcement After [Lopez], 144 U. Pa. L. Rev. 1469, 1505-11 __________________________ (1996). It follows inexorably that Congress lawfully can pass legislation designed to prevent the frustration of such interstate transactions. See, e.g., Allenberg Cotton Co. v. ___ ____ _____________________ Pittman, 419 U.S. 20, 34 (1974) (holding that Congress can _______ prevent the obstruction of interstate commerce by obviating state laws); Heart of Atlanta Motel, 379 U.S. at 275-76 (holding that _______________________ Congress has power to remove impediments to interstate commerce). The CSRA is such a law. It regulates the nonpayment of interstate child support obligations. Because child support orders that require a parent in one state to make payments to a person in another state are functionally equivalent to interstate 9 contracts, see Sage, 92 F.3d at 106, such obligations are ___ ____ "things" in interstate commerce. Thus, it is appropriate for Congress to enact legislation that will prevent their nonfulfillment. On this basis, the CSRA is a valid exercise of congressional power under the Commerce Clause. See Hampshire, 95 ___ _________ F.3d at 1003-04 (upholding the constitutionality of the CSRA on the ground that it regulates "what is essentially nonpayment of a debt where the judgment creditor and judgment debtor are in different states"); Mussari, 95 F.3d at 790 (reaching the same _______ conclusion and observing that a delinquent parent's "intentional refusal to satisfy the debt is as much an obstruction of commerce between the states as any act of extortion made unlawful by the Hobbs Act"); Sage, 92 F.3d at 105-06 (reaching the same ____ conclusion and observing that Congress "surely has power [under the Commerce Clause] to prevent the frustration of an obligation to engage in interstate commerce"). The appellant makes two last-ditch arguments on this point. First, he posits that cases such as Hampshire, Mussari, _________ _______ and Sage went awry because they did not recognize that the CSRA ____ is different from other federal statutes enacted under the aegis of the Commerce Clause. The difference, he says, is that the underlying payment obligation the child support order simpliciter is a creature of state law. This circumstance is fribbling. South-Eastern Underwriters illustrates that the ___________________________ state-law origins of an obligation do not preclude the exercise of congressional power under the Commerce Clause. The Court 10 there held, 322 U.S. at 546-47, that a fire insurance transaction across state lines constituted commerce among the several states, notwithstanding that the insurance policy itself was a personal contract subject to state law. The same principle obtains here: although the underlying child support order is a product of state law, the delinquent parent's location vis- -vis the minor child creates interstate nexus in the form of an obligation to make regular payments across state boundaries. Indeed, the CSRA applies only when the state-imposed child support order develops ____ an interstate character, necessitating the sending of money from one state to another by the obligor. When that occurs, the child support obligation lies in interstate commerce, subject to federal regulation, and Congress may act to prevent its frustration. The appellant's second argument posits that uncollected support payments have too tenuous an impact on interstate commerce to justify the exercise of congressional authority. This argument relies heavily on Lopez, a case in which the Court _____ struck down the Gun-Free School Zones Act (GFSZA), 18 U.S.C.  922(q)(1)(A), which criminalized the possession of firearms in local school zones. Holding that Congress exceeded its power under the Commerce Clause when it enacted the statute, the Court reasoned that gun possession in a local school zone is not economic activity of a type that substantially affects interstate 11 commerce. See Lopez, 115 S. Ct. at 1634. Lopez is inapposite ___ _____ _____ here.3 The Lopez majority considered only the third, "affecting _____ interstate commerce," branch of Commerce Clause authority, dismissing the first two bases as patently inapplicable. See id. ___ ___ at 1630. Here, however, we have no occasion to decide whether unpaid child support substantially affects interstate commerce; we instead uphold the CSRA under the second Commerce Clause category because it regulates things (namely, payment obligations) in interstate commerce. There is another, more basic reason why Lopez does not _____ assist the appellant's cause. The concerns articulated by the Lopez Court simply are not implicated by the CSRA. The Lopez _____ _____ Court observed that the GFSZA by its terms had no relation to any sort of economic enterprise, and that neither the statute nor its legislative history contained express congressional findings purporting to show the regulated activity's effects on interstate commerce. See id. at 1630-32. In contrast, the CSRA relates to ___ ___ economic transactions, and the enacting Congress made explicit, well-documented findings regarding the economic effect of unpaid child support upon interstate commerce. See, e.g., supra Part ___ ____ _____ II(A). In the same vein, the Lopez Court made much of the fact  ____________________ 3To the extent that the appellant relies on a quartet of district court decisions purposing to strike down the CSRA on the authority of Lopez, his reliance is misplaced. Two of them have _____ been reversed by the Ninth Circuit. See Mussari, 95 F.3d 787 ___ _______ (reversing United States v. Mussari, 894 F. Supp. 1360 (D. Ariz. _____________ _______ 1995), and United States v. Schroeder, 894 F. Supp. 360 (D. Ariz. _____________ _________ 1995)). We regard the other two, United States v. Parker, 911 F. _____________ ______ Supp. 830 (E.D. Pa. 1995), and United States v. Bailey, 902 F. _____________ ______ Supp. 727 (W.D. Tex. 1995), as infirm. 12 that the GFSZA contained no jurisdictional element to forge a link between the regulated activity and interstate commerce. See ___ Lopez, 115 S. Ct. at 1631. Such an element is conspicuously _____ present here, for the CSRA by its terms provides that jurisdiction will attach only if child support obligations cross state lines. See 18 U.S.C. 228(a); see also H.R. Rep. No. 102- ___ ___ ____ 771, supra, at 6 (underscoring that Congress designed the statute _____ "to target interstate cases only"). We have found the presence of such a jurisdictional element to be a powerful argument for distinguishing Lopez in other cases, see, e.g., United States v. _____ ___ ____ _____________ DiSanto, 86 F.3d 1238, 1245 (1st Cir. 1996) (upholding federal _______ arson statute, 18 U.S.C. 844(i)); United States v. Diaz- ______________ _____ Martinez, 71 F.3d 946, 953 (1st Cir. 1995) (upholding a federal ________ firearms possession statute, 18 U.S.C. 922(k)), and it is equally potent here. C. The Tenth Amendment. C. The Tenth Amendment. ___________________ Bongiorno next claims that the CSRA violates the Tenth Amendment (and, in the bargain, tramples principles of federalism and comity). This claim hinges on his contention that the CSRA falls beyond Congress' competence because it concerns domestic relations (an area traditionally within the states' domain). We reject the claim out of hand. The Tenth Amendment declares that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The amendment is not applicable 13 to situations in which Congress properly exercises its authority under an enumerated constitutional power. See New York v. United ___ ________ ______ States, 505 U.S. 144, 156 (1992). Inasmuch as Congress passed ______ the CSRA pursuant to the valid exercise of such an enumerated power (the power to regulate interstate commerce), that tenet governs here. Accord Hampshire, 95 F.3d at 1004; Mussari, 95 ______ _________ _______ F.3d at 791. What is more, a Tenth Amendment attack on a federal statute cannot succeed without three ingredients: (1) the statute must regulate the "States as States," (2) it must concern attributes of state sovereignty, and (3) it must be of such a nature that compliance with it would impair a state's ability "to structure integral operations in areas of traditional governmental functions." Hodel v. Virginia Surface Mining & _____ ___________________________ Reclam. Ass'n, Inc., 452 U.S. 264, 287-88 (1981) (internal _____________________ citations and quotation marks omitted). The CSRA passes this test with flying colors. It does not interfere with state law. To the contrary, the CSRA comes into play only after a state court issues a child support order, and it does not authorize a federal court to revise the underlying decree. Because Congress succeeded in drafting the CSRA "to strengthen, not to supplant, State enforcement efforts," 138 Cong. Rec. at H7326 (statement of Rep. Hyde), the law withstands Tenth Amendment scrutiny. In this wise, the appellant's analogy to the domestic relations exception to the federal courts' diversity jurisdiction is bootless. The CSRA contemplates criminal prosecutions (in 14 which federal jurisdiction runs nationwide, see 18 U.S.C. 3231 ___ (1994); see also DiSanto, 86 F.3d at 1246), not civil actions; ___ ____ _______ and, insofar as civil analogues might be helpful, the existence of the CSRA itself by analogy supplies an independent basis for federal jurisdiction because CSRA cases are cases "arising under" a federal statute, and thus more evocative of 28 U.S.C. 1331 than of 28 U.S.C. 1332. This leaves only federalism and comity. However, the appellant's emphasis on these aspirational doctrines cannot tip the balance. While federalism and comity are matters of legitimate concern, they are not grounds upon which courts may declare federal statutes unconstitutional. D. Additional Constitutional Claims. D. Additional Constitutional Claims. ________________________________ On appeal, Bongiorno asserts a gallimaufry of other constitutional challenges to his conviction, invoking among others, the Due Process and Equal Protection Clauses, and the Sixth and Eighth Amendments. Because these challenges are procedurally defaulted, we dispose of them without ado. Here, procedural default has two faces. The appellant failed to raise these miscellaneous constitutional arguments in the nisi prius court and matters not squarely presented below generally cannot be advanced on appeal. See United States v. ___ _____________ Taylor, 54 F.3d 967, 972 (1st Cir. 1995); United States v. Slade, ______ _____________ _____ 980 F.2d 27, 30 (1st Cir. 1992). This raise-or-waive rule applies full bore to constitutional claims. See Daigle v. Maine ___ ______ _____ 15 Med. Ctr., Inc., 14 F.3d 684, 688 (1st Cir. 1994). _______________ To make a bad situation worse, the appellant's briefs in this court advance these alleged constitutional violations in vague and cryptic terms. Appellate judges are not clairvoyants, and it is surpassingly difficult for us to make something out of nothing. Cf. William Shakespeare, King Lear act 1, sc. 4 (1605). ___ _________ We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation, see, e.g., Martinez v. Colon, 54 F.3d 980, 990 (1st Cir.), cert. ___ ____ ________ _____ _____ denied, 116 S. Ct. 515 (1995); Ruiz v. Gonzalez Caraballo, 929 ______ ____ __________________ F.2d 31, 34 n.3 (1st Cir. 1991); United States v. Zannino, 895 _____________ _______ F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990), and _____ ______ this case does not warrant an exception to that salutary practice. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . ." Zannino, 895 F.2d at 17. _______ For these reasons, we hold that appellant's other constitutional arguments none of which appear at first blush to possess discernible merit are procedurally defaulted.4 III. THE LEGALITY OF THE SENTENCE III. THE LEGALITY OF THE SENTENCE The appellant contends that the "intermittent confinement" condition of his probation exceeds the maximum term of imprisonment authorized by the statute of conviction. Because  ____________________ 4We have considered all the points, constitutional and nonconstitutional, to which the appellant alludes in challenging his conviction. None have the potential to justify relief. Those that we have not specifically identified are either unpreserved, or unworthy of discussion, or both. 16 Bongiorno did not raise this contention in the district court, we review it only for plain error. See United States v. Olano, 507 ___ _____________ _____ U.S. 725, 731-32 (1993); Taylor, 54 F.3d at 972. ______ Bongiorno is a first offender who, under the CSRA, can be imprisoned for no more than six months. See 18 U.S.C.  ___ 228(b)(1). Nevertheless, a sentencing court can impose probation for up to five years, see 18 U.S.C. 3561(a) & (c)(2) (1994), ___ and, as a condition of probation, the court in its discretion may require a defendant to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation." 18 U.S.C. 3563(b)(11) (1994). Invoking this discretionary power, the trial court sentenced Bongiorno to five years of probation, on condition that he remain in custody for twelve hours per day during the first twelve months of the probationary term. Judge Keeton reasoned that if "the defendant [were] in the custody of the Bureau of Prisons twelve hours during each night, that total time in a year would be six months" and therefore would not exceed the statutory maximum. On appeal the district court having stayed the operation of the intermittent confinement condition Bongiorno faults the judge's reasoning. He bases his argument principally on the "Schedule of Substitute Punishments" contained in the 17 federal sentencing guidelines.5 But, the sentencing guidelines do not affect this case; a first offense for a willful failure to pay child support is a Class B misdemeanor to which the guidelines do not apply. See U.S.S.G. 2J1.1, comment. (n.2).6 ___ Moving beyond the guidelines, the appellant's position is also unsound because it rests on an interpretation of 18 U.S.C. 3563(b)(11) that offends a bedrock maxim of statutory construction: all words and clauses in a statute are intended to have meaning and ought to be given effect. See United States ___ ______________ Dep't of Treasury v. Fabe, 508 U.S. 491, 504 n.6 (1993); United _________________ ____ ______ States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985). ______ ______________ To consider only the period of time (one year) for which the court imposed the condition of probation would ignore the number of hours the appellant actually will be confined and would thereby render the statutory allusion to the importance of the  ____________________ 5The provision states in pertinent part: One day of intermittent confinement in prison or jail for one day of imprisonment (each 24 hours of confinement is credited as one day of intermittent confinement, provided, however, that one day shall be credited for _______________________________ any calendar day during which the defendant _____________________________________________ is employed in the community and confined _____________________________________________ during all remaining hours); . . . . __________________________ U.S.S.G. 5C1.1(e)(1) (Nov. 1995) (emphasis supplied). 6We note in passing that, even if the guidelines attached, the intermittent confinement which the district court crafted probably would not qualify for full-day credit under U.S.S.G. 5C1.1(e)(1) because, while the order requires confinement up to twelve hours per day, it neither fixes a definite work schedule nor otherwise requires confinement for "all remaining hours" apart from time spent at work. 18 total number of hours ("totaling no more than") meaningless. We will not lightly encroach upon congressional prerogative by reading words out of a statute, see United States v. Victoria- ___ ______________ _________ Peguero, 920 F.2d 77, 81 (1st Cir. 1990), cert. denied, 500 U.S. _______ _____ ______ 932 (1991), and there is no warrant for doing so in this instance.7 In all events, the appellant did not raise the point below, and we discern no plain error. The appellant himself concedes that straight imprisonment for six months would be more onerous than intermittent confinement for one year. At the same time, the lower court's work-release arrangement advances the CSRA's primary objective of encouraging child support payments by affording the appellant an opportunity to practice his profession. Given these verities, it is evident that the sentencing order works no injustice. It follows that the alleged interpretive error cannot amount to plain error. See Olano, 507 ___ _____ U.S. at 732; Taylor, 54 F.3d at 973. ______ IV. THE GRASP OF THE FEDERAL DEBT COLLECTION PROCEDURE ACT IV. THE GRASP OF THE FEDERAL DEBT COLLECTION PROCEDURE ACT We turn now to the appeal in the civil case. That case began when the United States invoked the FDCPA and sought to  ____________________ 7The appellant also asseverates that the district court failed to satisfy the statutory stricture that requires a district court, among other things, to impose a sentence sufficient but not greater than necessary to reflect the severity of the offense, promote respect for the law, and afford adequate deterrence. See 18 U.S.C. 3553(a)(1)-(2). This asseveration ___ is meritless. The sentence artfully balances the appellant's persistent disregard of child support obligations and the desirability of deterrence against his need for liberty if he is to earn the money to which his minor daughter is entitled. 19 compel Bongiorno to pay the arrearage owed as back child support. The government assumed that since Bongiorno had been ordered to make restitution of this sum as part of the punishment imposed in the criminal case, it had access to the FDCPA as a means of collecting the debt. The district court honored the government's assumption and granted a writ of garnishment. On appeal, Bongiorno maintains that the court should have defenestrated the civil action because a restitution order issued pursuant to the CSRA is not a "debt" within the meaning of the FDCPA. We agree. A. The FDCPA. A. The FDCPA. _________ Congress enacted the FDCPA as Chapter XXXVI of the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4933, effective May 29, 1991, thus creating a framework under which the United States might more efficiently collect debts owed to it. The framework includes procedures that the government can utilize to recover on, or secure, such debts, and to that extent relieves the federal sovereign's need to rely on a patchwork of state laws. See H.R. Rep. No. 101-736, at 23-25 (1990), reprinted in ___ _________ __ 1990 U.S.C.C.A.N. 6472, 6631-33; see also Selbe v. United States, ___ ____ _____ _____________ 912 F. Supp. 202, 205 (W.D. Va. 1995). Congress passed the FDCPA with an end game in mind: to "lessen[] the effect of delinquent debts on the massive federal budget deficit now undermining the economic well-being of the Nation." H.R. Rep. No. 101-736, supra, at 23, 1990 U.S.C.C.A.N. _____ at 6631. Consistent with this goal, Congress "defined [`debt'] broadly to include amounts owing to the United States on account 20 of a direct loan or loan insured or guaranteed by the United States as well as other amounts originally due the United States." Id. at 28, 1990 U.S.C.C.A.N. at 6636. Notwithstanding ___ this breadth of definition, Congress restricted the statute's grasp to those obligations owing to the federal government. See ___ 28U.S.C. 3002(3), (15).8 Thislimitation didnot ariseby accident: The definition of `debt' was carefully written to make clear that the act will not apply to obligations which began as purely private loan or contract obligations. For example, if one of our constituents goes to his neighborhood bank or thrift and takes out a business or personal loan, that transaction is between him and the bank or thrift. . . . This is true even if the bank or thrift later fails and is taken over by Federal regulators. If the Federal Government seeks  ____________________ 8The FDCPA defines "debt" as: (A) an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or (B) an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States; . . . . 28 U.S.C. 3002(3). In this connection it defines "United States" as: (A) a Federal corporation; (B) an agency, department, commission, board, or other entity of the United States; or (C) an instrumentality of the United States. 28 U.S.C. 3002(15). 21 to recover these loan or contract obligations . . . it is not eligible to use the new procedures in this act. 136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990) (statement of Rep. Brooks). Mimicking the way in which Congress chose to define the statute's terms, courts have tended to draw the line between included and excluded debts depending on whether a particular debt is owed to the United States in the sense that the debt's proceeds, if collected, will inure directly to the government's benefit (in contrast to benefitting a third party). Thus, a fine which is payable to the government and which, when paid, swells the public fisc is a debt for purposes of the FDCPA. See ___ United States v. Coluccio, 51 F.3d 337, 339 (2d Cir. 1995); ______________ ________ United States v. Coluccio, 19 F.3d 1115, 1116 (6th Cir. 1994). ______________ ________ Similarly, federal tax indebtedness which is owed to the government and which, when collected, is deposited in the Treasury is a debt for purposes of the FDCPA. See Markham v. ___ _______ Fay, 74 F.3d 1347, 1354 (1st Cir. 1996). A promissory note held ___ by the Small Business Administration the proceeds of which will enrich the government's coffers when payment is effected is also a debt for FDCPA purposes. See United States v. Golden ___ _____________ ______ Elevator, Inc., 868 F. Supp. 1063, 1066-67 (C.D. Ill. 1994) _______________ (dictum). By like token, cleanup expenses in environmental cases which are owed by statute to the government, see 42 U.S.C.  ___ 9607(a)(4)(A) (1994), and which are used to reimburse or defray monies actually expended by it are considered debts for 22 purposes of the FDCPA. See United States v. Dickerson, 790 F. ___ ______________ _________ Supp. 1583, 1584-85 (M.D. Ga. 1992). This approach squares neatly with the statute and its legislative history. The types and kinds of debts enumerated in section 3002(3) for example, "a direct loan," an "insured or guaranteed" loan, an amount owing as an unpaid "fee" or "duty" seem to contemplate payments in which the government has a direct pecuniary stake. The legislative history sounds much the same theme. See H.R. Rep. ___ No. 101-736, supra, at 23, 1990 U.S.C.C.A.N. at 6631. _____ B. The Status of the Debt. B. The Status of the Debt. ______________________ Mindful of the statutory definitions, the legislative history, and the way in which courts have approached the problem of determining which debts are within the FDCPA's grasp and which are not, we conclude that inclusion necessitates an inquiry aimed at determining to whom the debt is owed and to whose benefit the proceeds of the debt will inure when it is paid. At the very least, a debt cannot qualify if both parts of this inquiry point toward exclusion: a debt cannot be eligible for inclusion under the FDCPA if the United States is neither the formal owner nor the direct beneficiary of it. In all events, the debt must clear an additional hurdle: it must be one that, in the parlance of the statute, "is not owing under the terms of a contract originally entered into by only persons other than the United States." 28 U.S.C. 3002(3).9  ____________________ 9In passing the FDCPA, Congress evinced a clear intent to exclude private transactions debts created under (and thus governed by) state law, and to which the United States was not an 23 To be sure, the district court made no such inquiry, but instead allowed the government's application for a writ of garnishment in a margin order after striking the appellant's pleadings. Before us, however, the government has not raised any procedural objections or technical defenses. Rather, it concedes that it can employ the FDCPA only if the restitution order constitutes a debt within the meaning of the FDCPA. See ___ Appellee's Brief at 9. The parties have briefed and argued this issue on the merits without reservation, and it is therefore within our proper province to determine whether the restitution order that the government seeks to enforce comes within the penumbra of the FDCPA. The government's affirmative answer to this question leans heavily on the majority opinion in NLRB v. E.D.P. Med. ____ ___________ Computer Sys., Inc., 6 F.3d 951 (2d Cir. 1993). In that case, ____________________ the Second Circuit considered whether a backpay award decreed by the National Labor Relations Board (NLRB) to remedy an unfair labor practice constituted a debt to the United States within the purview of the FDCPA. The panel divided over the issue. The majority started by holding that the award was a debt due to the federal government since it had been imposed on the defendant by a federal agency:  ____________________ original party from the grasp of the FDCPA. See H.R. Rep. No. ___ 101-736, supra, at 23, 1990 U.S.C.C.A.N. at 6631. In this vein, _____ a main proponent of the bill emphasized that to warrant inclusion the transaction underlying the debt must be one in which the government was a direct, original participant. See 136 Cong. ___ Rec. H13288, supra. The final version of the FDCPA codifies this _____ legislative intent. 24 It is precisely because the Board acts in the public's interest and not those of private individuals that persuades us that the backpay award sought by the Board may be considered a debt to the United States under the FDCPA. The Board serves as more than a mere conduit when it initiates an action to collect a backpay award. Id. at 955. Having stated this proposition, the majority then ___ skimmed over the beneficial ownership aspect, gave great weight to the fact that without federal intervention the award could not be collected,10 and ruled that the FDCPA applied. See id. The ___ ___ dissenting opinion stressed that the backpay award could not be considered a debt owed to the United States within the ambit of the FDCPA because any money collected by the NLRB would flow to the pockets of the victimized employees and would not directly benefit the government. See id. at 958 (Walker, J., dissenting). ___ ___ Passing the obvious distinction between E.D.P. and this ______ case E.D.P. is readily distinguishable because there the NLRB ______ was the only entity empowered by law to enforce the backpay award, see supra note 10, whereas here the debt is enforceable by ___ _____ the parties to whom the money, when collected, actually will flow11 we believe that Judge Walker's dissent provides better  ____________________ 10The NLRB imposed the backpay award under the National Labor Relations Act. See 29 U.S.C. 151-169 (1994). In such ___ circumstances, the NLRB is the only entity empowered by law to enforce the award. See Amalgamated Utility Workers v. ___ ______________________________ Consolidated Edison Co., 309 U.S. 261, 264-70 (1940) ___________________________ (interpreting 29 U.S.C. 160(a)). 11The appellant's ex-wife and minor daughter have available mechanisms to enforce the CSRA restitution order, see 18 U.S.C.  ___ 3663(h) (1994) (providing that an order of restitution in a CSRA case may be enforced either by the United States or "by a victim named in the order"), as well as the child support order 25 guidance for us than does the majority opinion. While there may be a somewhat stronger argument for regarding a debt as owing to the United States if the federal government is the only entity able to recover it (the E.D.P. scenario), the decision to extend ______ the FDCPA to such a situation is a decision properly reserved for the legislative branch. Because the statute, as written, contains no language suggesting that all debts subject to exclusive federal enforcement are included within the grasp of the FDCPA, we find the position taken by the E.D.P. majority to ______ be unsatisfactory. The force of Judge Walker's opinion is but one of several factors that influence our judgment. The most important factor is the language and purpose of the statute itself. Nearly as telling is a mature but still viable precedent. Forty-five years ago, the Supreme Court wrestled with a very similar question under the Bankruptcy Act. See Nathanson v. NLRB, 344 ___ _________ ____ U.S. 25 (1952). The statutory scheme that the Court pondered used a concept of public debt that bears a strong family resemblance to the concept that fuels the FDCPA. It provided that, with exceptions not relevant here, "debts owing to . . . the United States" would "have priority, in advance of the payment of dividends to creditors." 11 U.S.C. 104(a) (West Supp. 1952) (repealed 1978). The precise question before the Nathanson Court was whether an NLRB award for backpay was a debt _________ owing to the United States (and, thus, entitled to priority in  ____________________ underlying it. 26 bankruptcy). The Court acknowledged that the NLRB was an agent of the United States and a creditor (being the only party entitled to enforce the claim), but stated that it did not follow that the debt was owing to the United States within the meaning of the Bankruptcy Act. 344 U.S. at 27. Priority in bankruptcy was intended "to secure an adequate revenue to sustain the public burthens and discharge the public debts," yet granting priority in this instance would not further those goals because the beneficiaries of the claim were private persons. Id. at 27-28 ___ (citation and internal quotation marks omitted). On this basis, the Court concluded that the debt was not owed to the United States in the relevant sense and therefore was not entitled to the statutory priority. See id. at 28. ___ ___ Nathanson bears a close affinity to this case. For one _________ thing, the language of the FDCPA parallels that of the bankruptcy provision discussed in Nathanson. For another thing, the _________ legislative purpose underlying the FDCPA is analogous to the legislative purpose distilled by the Nathanson Court. Congress _________ enacted the FDCPA to relieve the strain on the federal deficit created by persistent nonpayment of debts owed to the United States. See H.R. Rep. No. 101-736, supra, at 23, 1990 ___ _____ U.S.C.C.A.N. at 6631. This mirrors the congressional concern that drove the bankruptcy priority provision which the Nathanson _________ Court was called upon to construe. See Nathanson, 344 U.S. at ___ _________ 27-28. Accordingly, in both the FDCPA and the bankruptcy milieux, the statutory mechanism does not serve the legislative 27 purpose except when it operates in regard to a debt whose recovery will directly augment the public coffers. Since the dynamic in this case tracks the dynamic that was at work in Nathanson the relation of the government's beneficial interest _________ in the debt to the statutory scheme is very much the same  Nathanson's ratio decidendi controls our deliberations. _________ _____ _________ The force of this conclusion is not dissipated merely because the government secured the restitutionary order. After all, Nathanson instructs us to look beyond such formalities. See _________ ___ id. at 28 (explaining that a court must refuse to treat as an ___ included debt "a claim which the United States is collecting for the benefit of a private party"). In this case, the government is not the holder of the debt in any legally cognizable sense, and it seeks to collect restitution not to its own behoof but for the benefit of a private party (Bongiorno's daughter). Because the order of restitution here like the backpay award in Nathanson involves no direct pecuniary interest of the federal _________ sovereign, it does not create a debt owing to the United States within the meaning of the FDCPA. The government also tries to dodge this bullet by touting its indirect interest in the award. It tells us that ________ public assistance substitutes for most of the $5 billion annual shortfall in unpaid child support, and that there is thus a demonstrable public interest in enforcing restitutionary orders issued in CSRA cases. We agree that this is an area of public concern, but that is beside the point. A similar sort of "for 28 the general good" argument was made to, and dismissed by, the Nathanson Court. See id. (rejecting the argument that the _________ ___ ___ government's abiding interest in eliminating unfair labor practices warranted stretching the statute to secure a preference in payment for backpay awards). The sockdolager, of course, is that Bongiorno's daughter is not on the welfare rolls. Hence, the government has failed to show any direct pecuniary interest of a kind that would render this debt collectible by the United States under the FDCPA. The government has one last shot in its sling: the FDCPA specifically mentions "restitution" among the classes of included debt, see 28 U.S.C. 3002(3)(B) (quoted supra note 8), ___ _____ and the government posits that we need not look beyond this label. The argument will not wash. The FDCPA does not state that every order of restitution, no more than every "rent" or _____ every type of "reimbursement," constitutes an included debt. Rather, the text limits the statute's applicability to restitution that implicates a "source of indebtedness to the _______ United States." Id. (emphasis supplied). _____________ ___ This added language reintroduces the concept of benefit. Some restitutionary orders create debts that owe beneficially to the federal government and thus fall within the purview of the FDCPA. A prototypical case is United States v. _____________ Gelb, 783 F. Supp. 748 (E.D.N.Y. 1991). Gelb involved ____ ____ restitution under the RICO statute. Since that statute declares that a convicted person must "forfeit to the United States" any 29 ill-gotten gains, see 18 U.S.C. 1963(a) (1994), the federal ___ government is the direct beneficiary of the restitution order and the order thus creates a debt collectible under the FDCPA. See ___ Gelb, 783 F. Supp. at 752. But other types of restitution, ____ which, when paid, will not increase public revenues (say, restitution to an individual victim of a crime), do not come within the statutory encincture. In short, we cannot isolate a single word "restitution" and conclude that every order bearing that label automatically falls within the FDCPA's grasp. The federal government may collect under the FDCPA only restitution that is "owing to the United States." 28 U.S.C.  3002(3). We end where we began. Because restitution ordered under the CSRA is not owed to the United States in an economically meaningful sense, the government cannot utilize the FDCPA as a vehicle for collecting such awards. On this view of the case, we do not reach the question of whether the debt must be considered as private in character (and thus ineligible for inclusion under the FDCPA on that basis) because a state court order created the underlying child support obligation, and both the obligor and obligee are private parties.12  ____________________ 12We note in passing that a cogent argument can be made for the proposition that what started as a debt owed by one private party (Bongiorno) to another (Taylor, on behalf of the couple's daughter) remains so in its collection, and that the peripheral involvement of the federal government does not change the obligation's inherently private character. Indeed, the belated federal entry into this situation bears a striking resemblance to the "failed thrift" example that Chairman Brooks used to illustrate a debt that would be excluded from the FDCPA's grasp. ________ 30 Because the government sued under an inappropriate statute, we must reverse the judgment in the civil case. This is not to say, however, that the appellant can thumb his nose at the restitution order. Payment of restitution is a condition of his probation, and the government has adequate remedies if a convicted defendant flouts a condition of probation. See, e.g., ___ ____ 18 U.S.C. 3663(g), 3583(e) (1994). The government, moreover, can attempt to collect the restitution order by resort to other civil remedies, see 28 U.S.C. 3003(b) (providing that the ___ United States retains its authority under laws other than the FDCPA to collect debts owed to the government); see also Fed. R. ___ ____ Civ. P. 64 & 69; see generally Custer v. McCutcheon, 283 U.S. ___ _________ ______ __________ 514, 516-19 (1931) (discussing application of various state statutes to executions on judgments recovered by the United States), and, as mentioned earlier, Bongiorno's ex-wife and daughter have ample recourse, see supra note 11. But to allow ___ _____ the federal government to proceed under the FDCPA for no more persuasive reason than that collecting the debt serves the public interest would cavalierly consign Nathanson to the scrap heap _________ and, in the bargain, expand the FDCPA's scope without limitation. We are not at liberty to chart so free-wheeling a course. V. EPILOGUE V. EPILOGUE We need go no further. To recapitulate, we discern neither a constitutional flaw in the fabric of the Child Support Recovery Act nor any other reversible error marring the  ____________________ See 136 Cong. Rec. H13288 (quoted supra p. 21). ___ _____ 31 appellant's conviction and sentence. We therefore affirm the judgment in the criminal case. The civil case, however, yields a diametrically opposite outcome. Because the federal government does not have a direct pecuniary interest in the avails of the restitutionary order, we hold that the order is not a debt owing to the United States subject to collection under the FDCPA.13 The government's ancillary civil action ought therefore to have been dismissed. Affirmed in part and reversed in part. The cases are remanded to Affirmed in part and reversed in part. The cases are remanded to _____________________________________ _________________________ the district court for further proceedings consistent with this the district court for further proceedings consistent with this _________________________________________________________________ opinion. No costs. opinion. No costs. _______ ________  ____________________ 13Given this holding, we need not address the appellant's claim that the district court improperly struck his pleadings for failure to comply with local rules governing appearances by out- of-state counsel. 32