# United States Court of Appeals
## For the First Circuit

No. 09-1720

UNITED STATES OF AMERICA,

Appellee,

v.

HORACE W. SALLEY, III,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Peter J. Cyr for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief for
appellee.

June 29, 2011

**THOMPSON**, **Circuit Judge**.  A Maine jury found Horace W. Salley, III guilty of possession of a firearm following a conviction of misdemeanor domestic violence in violation of 18 U.S.C. § 922(g)(9).[1]  Salley appeals claiming prosecutorial misconduct.[2]  Finding no error, we affirm.

---

[1] "It shall be unlawful for any person who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commence."  18 U.S.C. § 922(g)(9).

[2] As a housekeeping matter, we note that Salley supplemented his counsel's prosecutorial misconduct argument by raising a host of other issues in a pro se brief.  In particular, Salley claimed his conviction violated his Second Amendment right to bear arms and that he was denied his Sixth Amendment right to effective counsel.  Salley also simply listed in numerical form what he termed "miscellaneous other issues" with no corresponding arguments.  The "issues" related to, among other things, the chain of evidence, sentencing, and the applicability of the Interstate Commerce Clause.

We will not address any of Salley's pro se arguments as they are not properly before us.  Salley did not raise the Second Amendment argument below in his motion for a new trial and therefore it is waived.  See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997).  Salley's "miscellaneous other issues" are also waived for his failure to raise them below and for their perfunctory treatment on appeal.  Id.  Finally, Salley's Sixth Amendment argument is also procedurally deficient because a habeas corpus petition, not a direct appeal, is the proper vehicle for an ineffective assistance of counsel claim.  See United States v. García-Pastrana, 584 F.3d 351, 388 (1st Cir. 2009).  We do not review ineffective assistance of counsel claims on direct appeal absent an evidentiary record that would allow us to sufficiently evaluate the claim, and we do not have such a record here.  Id.

## BACKGROUND

### The Arrest

Horace and Skyla Salley began dating in May 2005 and were married in December of that year.[3] Skyla had two children from a previous relationship and was pregnant with Salley's baby at the time of the wedding. From the start, the couple's relationship was a tumultuous one and things came to a head on November 25, 2006, when a 911 operator received a domestic assault complaint from Skyla, who indicated that Salley had a gun. State trooper Carmen Lilley was dispatched to the couple's home in Smyrna Mills, Maine.

Upon arrival, Lilley met Salley in the yard. Salley first tried to deny that the 911 call originated from his home but Lilley was not buying it. Salley then admitted his identity and Lilley cuffed him on suspicion of domestic assault. Lilley next asked Salley three times where his gun was and each time Salley denied having a gun or that there was a gun in the house. Lilley left a cuffed Salley in the squad car and went into the home where he found a visibly shaken Skyla with the couple's baby in the bedroom. Skyla and Lilley spoke about what had happened, including the fact that Salley had a gun, with which he had previously threatened her. Skyla also informed Lilley about the specific

---

[3] For ease of reference, we refer to Horace Salley as "Salley" and Skyla Salley as "Skyla".

-3-

circumstances surrounding Salley obtaining the gun (discussed fully below). She then retrieved the gun out of the bedroom closet.

## The Trial

Salley was arrested and charged with knowingly possessing a firearm after being convicted of misdemeanor domestic assault. The underlying domestic assault conviction involved an assault against an ex-girlfriend. At the time of trial, Skyla and Salley had divorced.

The main focus of the trial was whether the gun that police seized from the Salley home (a Bushmaster Bullpup assault rifle) was in fact Salley's. To establish this critical fact, the government first called William Steinhagen, who had purchased a Bushmaster Bullpup rifle at a shop in New Hampshire in 2003. Steinhagen testified that he traded the rifle sometime around 2005 to a man in Maine for a 1946 Chevy. The trade came about when Steinhagen answered an advertisement the man had placed in a regional classified ad magazine called Uncle Henry's Swap and Sell Guide. Steinhagen traveled to Maine to make the trade and though he could not recall the man's name, he described his appearance and age as being similar to Salley's. Steinhagen also testified that he called the man's cell phone en route to the trade and the government established through cell phone records that the phone number Steinhagen called was Salley's. The Uncle Henry's advertisement was also admitted into evidence and it listed

Salley's cell phone number as the contact number and the town he was living in as the relevant town. Steinhagen went on to identify the firearm seized from Salley's home as the gun that he had purchased and then traded. Steinhagen also confirmed that the serial number on the gun seized from the Salley home matched the serial number on the paperwork for the gun he bought.

Skyla also offered testimony regarding the gun's origins. She was with Salley, she recalled, when he placed the Uncle Henry's advertisement and when a man called in response to the ad. Then in late 2005, Skyla went with Salley to Detroit, Maine where she waited in the car while Salley met with the man and obtained the gun. Skyla thought Salley traded his flatbed truck for the gun.

The government also called two of Salley's acquaintances, David Smith and his father, James Smith. As David remembered, Salley visited the Smith home in November 2005 with a woman. Skyla, being that woman, confirmed this gathering. David indicated that during the visit Salley showed them a gun, fired it at an old car in the yard, and let David fire it too. David identified the gun police seized from the Salley home as the gun he fired with Salley. James Smith, David's father, also testified that Salley came to his home in November 2005 and that he caught a glimpse of Salley with a gun. James also heard the gun being fired, leading him to believe it was a semi-automatic gun. It was his understanding that Salley received the gun via trade in exchange

for either his flatbed wrecker or Chevy coupe. James said he knew Salley from trading items with him.

In addition to testifying about Salley's acquisition of the gun, Skyla also described her and Salley's home-life. The following testimony is relevant to this appeal. In October 2005, the Maine Department of Health and Human Services ("DHHS") took Skyla's oldest child away from her because caseworkers believed that Salley was a threat to the child. Realizing she had to make a decision between Salley and her children - and choosing the latter - Skyla broke it off with Salley. Her first step was checking into a women's shelter and obtaining a protection-from-abuse order against Salley out of fear for her life and safety. Skyla obtained the order in December 2005, and in the underlying complaint she claimed Salley owned a gun and had threatened her with it.

The couple's separation was short-lived, and in January 2006 the reunited pair moved into the Smyrna Mills home, which was purchased partially in Skyla's name. About two weeks after they bought the house, Skyla said Salley retrieved his gun from a storage unit and brought it into the home where he primarily kept it in his tool room. Skyla recalled seeing Salley handle the gun and in particular she noted an instance a month before he got arrested where he had the gun in his hands while he sat on the bed in the bedroom. During the month leading up to his arrest, Salley,

as Skyla recounted, threatened more than once to shoot her with the gun.

After the government concluded its case, Salley presented a series of witnesses though he chose not to testify himself. Salley called among others, DHHS case workers, the realtor who handled the Smyrna Mills property sale, and neighbors. Significant for purposes of this appeal, Salley called Rebecca Hughes, the woman who purchased the Salleys' Smyrna Mills home from them. Hughes testified that she began moving boxes containing her and her roommates' belongings into the home around November 11, 2006, which was just prior to Salley's arrest.

Defense counsel rested and closing arguments followed. The government highlighted the testimony of Steinhagen, Lilley, and the Smiths. The prosecutor argued that this testimony was enough to convict Salley, in the event the jury did not find Skyla credible. While the prosecutor downplayed Skyla's significance, defense counsel's summation focused on her. Essentially, the defense theory was that Skyla (perhaps in cahoots with David Smith) connived to put Salley in jail in order to keep DHHS off her back and so she could keep the sale proceeds from the Smyrna Mills home for herself. The jury wasn't convinced and found Salley guilty after a short deliberation.

## Post-Trial

Four days after the jury issued its verdict, the trial judge sua sponte raised a concern about statements made by the prosecutor during the government's closing. The statements were:

> Prosecutor: The bottom line is, the gun that Mr. Steinhagen bought in New Hampshire was recovered from the defendant's bedroom on the date alleged in the indictment. **There's been no suggestion that it was planted there. There's been no suggestion that Mr. Salley didn't know it was there.**

The trial judge expressed concern that this statement might (1) contradict the evidence, (2) imply Salley had the burden of proof, and/or (3) be perceived as a comment on Salley's decision not to testify. Apprised of the court's concerns, Salley filed a motion for a new trial based on the prosecutor's statements.

In a written decision, the district court denied Salley's motion. While the court found that the prosecutor's second statement[4] was inaccurate and that the jury would likely perceive it as a commentary on Salley's failure to take the stand; the court concluded that the error was harmless in light of the cumulative evidence and the court's jury instructions. Salley appealed the denial of his new trial motion to this court.

## STANDARD OF REVIEW

Salley did not contemporaneously object to the prosecutor's statements and therefore we review for plain error.

---

[4] "There's been no suggestion that Mr. Salley didn't know it was there."

See United States v. Robinson, 473 F.3d 387, 393 (1st Cir. 2007). "Plain error requires a showing (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Landry, 631 F.3d 597, 606 (1st Cir. 2011) (internal quotation marks and citation omitted). In other words, we must question whether Salley can show both error and prejudice. See United States v. Kinsella, 622 F.3d 75, 84 (1st Cir. 2010). Plain error reversals are limited to blockbuster errors and not ordinary backfires. See United States v. Ortiz, 447 F.3d 28, 35 (1st Cir. 2006).

We determine the legal question of whether the prosecutor's comments constituted misconduct de novo. See United States v. Casas, 425 F.3d 23, 39 (1st Cir. 2005). However, we review whether the misconduct, if any, warranted a new trial for abuse of discretion. See Robinson, 473 F.3d at 393.

### ANALYSIS

### The First Statement

We begin with the first statement: "There's been no suggestion that it was planted there." Simply put, there is nothing improper about this statement. By his own admission, Salley's defense theory was that Skyla framed him - obtaining and planting the gun herself. Defense counsel's closing reflected this

-9-

theory.[5]  Additionally, Salley presented the testimony of Rebecca Hughes, who purchased the Smyrna Mills home and moved boxes in prior to Salley's arrest.  Obviously Salley's purpose in calling this witness was to imply that the gun was amongst Hughes' boxed possessions.

By advancing these two theories, Salley opened the door to the statement at issue.  The government is permitted to comment on the plausibility of the theory that Skyla or Hughes planted the gun.  See United States v. Glover, 558 F.3d 71, 78 (1st Cir. 2009).  When commenting on the tenability of a defense theory, the prosecutor must focus on what the evidence has or hasn't shown, "rather than on the defendant and what he or she has shown or failed to show."  Id.  Here the prosecutor, referencing the defense trial theory, did just that by saying "[t]here's been no suggestion . . . ."  See United States v. Wilkerson, 411 F.3d 1, 8-9 (1st Cir. 2005) (finding prosecutor's remark that "there's no real evidence" would likely be construed by a jury to refer to defendant's failure to produce evidence supporting his theory, as opposed to his

_____

[5] Defense counsel queried during closing: "Does [Skyla] have an incentive herself to put Mr. Salley away so she can continue to make some more bad choices with different men?"  Later in the closing, counsel speculated as to Skyla's thought process: "So what do I have to do?  I have to get rid of Mr. Salley in a way that doesn't bounce back on me.  What's a good way to do that, put him in jail? Perhaps." Counsel drove the point home: "Ms. Salley has, frankly, so many reasons and lies that she has told and reasons and incentives that she has to put [Salley] away that it's, frankly, impossible to sort out what her incentives, rationales, and motivations are, but clearly they're there."

failure to testify).  This court has previously been reluctant to find plain error when a prosecutor's remarks are made to rebut an argument by defense counsel and are commensurate with that purpose. See United States v. Taylor, 54 F.3d 967, 978 (1st Cir. 1995). Considering the above and given the high standard for plain error, we find no plain error with respect to the first statement.

### The Second Statement

We proceed to the second statement: "There's been no suggestion that Mr. Salley didn't know it was there."  This statement is more problematic and requires a deeper delving.  We do so by addressing the arguments raised by Salley, which mirror the district court's concerns: (1) the statement shifts the burden of proof and (2) the statement comments on Salley's failure to testify.[6]

With respect to Salley's first argument, we have held that "as to comments that shift the burden . . . 'a prosecutor may cross the line [into impermissibility] by arguing to the jury that the defendant is obligated to present evidence of his innocence.'" Glover, 558 F.3d at 77 (internal citation omitted).  We do not believe that line was crossed here.  In particular, the prosecutor did not argue that Salley "had the burden to prove another set of

---

[6] As noted above, the district court was also concerned (and ultimately found) that the second statement was inaccurate in light of Officer Lilley's testimony that Salley three times over denied knowledge of a gun in his home.  Salley has not however raised the statement's inaccuracy as a ground for this appeal.

-11-

facts." Wilkerson, 411 F.3d at 8. Rather, the prosecutor's statement drew attention to the lack of evidence that Salley was unaware of the gun's presence in his home. Such a statement is distinguishable from those we have previously found to be improper burden shifting comments. See United States v. Roberts, 119 F.3d 1006, 1015 (1st Cir. 1997) (prosecutor remarked that "when a defendant does 'go forward' to offer evidence, 'the defendant has the same responsibility [as the government] and that is to present a compelling case'"); United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996) (prosecutor stated "if [defense counsel] can stand up and explain away that conversation to you, then you should [acquit] . . . There's just no other explanation except the one that's been provided . . . by the government."). In these cases, the prosecutor specifically said that the defense had a burden to present evidence. That is not so with the comment at issue. Salley's burden shifting claim is without traction.

Salley's second argument - that the prosecutor impermissibly commented on his failure to testify - presents us with a closer question. To determine whether a comment trod on a defendant's Fifth Amendment right against self incrimination, this court "ask[s] whether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Glover, 558 F.3d at 77. Here it is undisputed that

-12-

the prosecutor did not intend to comment on Salley's failure to testify. Therefore our focus is on how the jury may have perceived the comment.

Undoubtedly the prosecutor's statement is not a barefaced reference to Salley's choice not to take the stand. Cf. United States v. Skandier, 758 F.2d 43, 45 (1st Cir. 1985) (prosecutor asked the jury to "see if [defense counsel] can explain the story" any differently than the prosecutor had); United States v. Cox, 752 F.2d 741, 745 (1st Cir. 1985) (prosecutor stated "how does [defendant] explain" certain evidence). However, because only Skyla and Salley lived in their home - and Skyla testified that Salley knew the gun was in the home - it can be argued that Salley was the only other person who could have testified as to his knowledge of the gun's locale. Thus the jury may have perceived the statement as commentary on Salley not testifying. At the same time, it is conceivable that the statement (albeit clumsily) highlighted for the jury the absence of any testimony from defense witness Rebecca Hughes that she put the gun in the closet and that, to her knowledge, Salley was not aware of its presence.

This second interpretation finds favor in the principle that courts "should not lightly infer . . . that a jury, sitting through a lengthy exhortation, will draw [the most damaging] meaning from the plethora of less damaging interpretations." United States v. Lilly, 983 F.2d 300, 307 (1st Cir. 1992).

-13-

Further, we "are especially reluctant to 'fish in the pool of ambiguity' when, as now, the complaining party failed to bring a dubious comment, easily corrected on proper notice, to the immediate attention of the trial court." Taylor, 54 F.3d at 979 (internal citation omitted).

Ultimately we need not grapple with this issue further. Although the prosecutor's statement debatably could be perceived as a reference to Salley's failure to testify, the statement is not grounds for reversal because there was no prejudice.

This court "will not reverse unless the prosecutor's remarks so poisoned the well that the trial's outcome was likely affected." United States v. Shoup, 476 F.3d 38, 43 (1st Cir. 2007) (internal quotation marks and citation omitted). Factors to be considered are: (1) the severity of the misconduct, (2) whether it was deliberate or inadvertent, (3) the context in which it occurred, (4) the likely effect of any curative instructions, and (5) the strength of the government's evidence of guilt. Id. at 44.

Assuming the prosecutor's statement was misconduct, it was not severe but rather a limited (though admittedly inaccurate) reference to the evidence. Further there is zero indication that the prosecutor's comment was a deliberate reference to Salley's failure to testify. The statement was made only once during closing arguments and not elaborated on. In fact, the prosecutor herself contradicted the statement (correctly stating the evidence)

earlier in her closing.[7] Defense counsel did the same during his closing.[8]

To boot, defense counsel's failure to object to the comment "increases the likelihood that the effect on the jury was likewise fleeting and evanescent." Shoup, 476 F.3d at 44. And although the lack of an objection means there was no specific curative instruction, the court did instruct the jury in both its preliminary and final jury instructions that the lawyers' comments and closing arguments were not evidence and that the jury's memory of the evidence controlled. The court also drew attention to Salley's constitutional right not to testify and cautioned the jury that it should not draw a negative inference from this choice. We assume the jury to have followed these instructions. See Morales-Vallellanes v. Potter, 605 F.3d 27, 34-35 (1st Cir. 2010).

Last but not least, the evidence linking Salley to the gun was tremendous: (1) the Uncle Henry ad, (2) phone records, (3) Skyla's testimony (including an in-court identification of the seized gun as Salley's), (4) Steinhagen's testimony (including an in-court identification of the seized gun as the one he traded), (5) David Smith's testimony (including an in-court identification

---

[7] The prosecutor stated: "[Lilley] then asked [Salley] three different times if there was a gun in the house, if he had a gun, where's the gun, and on each occasion, Mr. Salley said, no, I don't have a gun, I don't know anything about a gun."

[8] Defense counsel indicated: "Mr. Salley denied ever having known anything about a gun. The government pointed that out."

of the seized gun as the one he shot with Salley), and (6) James Smith's testimony.  And despite Salley's contention to the contrary, it is not a foregone conclusion that Skyla's testimony should be discounted as unreliable.  The defense theory that Skyla entered into a year long conspiracy with some unknown accomplice to frame Salley is entirely unsupported by the evidence.

The statement at issue was not significant enough to affect Salley's rights or seriously impair his trial.  See Landry, 631 F.3d at 606.  Salley has not surmounted the high hurdle of the plain error standard.  See Ortiz, 447 F.3d at 36.

## CONCLUSION

To sum up, the prosecutor's statements did not constitute plain error and thus the district court did not abuse its discretion in denying Salley's motion for a new trial.  The district court is affirmed.