# United States Court of Appeals
## For the First Circuit

No. 05-1645

UNITED STATES OF AMERICA,

Appellee,

v.

GARY P. DECICCO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella and Lynch, Circuit Judges,
and Lasker,[*] Senior District Judge.

Joseph S. Oteri, with whom Kimberly Homan were on brief, for appellant.
Robert E. Richardson, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, were on brief, for appellee.

March 2, 2006

---

[*] Of the Southern District of New York, sitting by designation.

**TORRUELLA**, **Circuit Judge**. On September 27, 2000, a grand jury sitting in Boston, Massachusetts returned an indictment charging Gary P. DeCicco ("appellant") with four counts of mail fraud, in violation of 18 U.S.C. § 1341, in connection with claims for insurance proceeds submitted in the wake of two 1995 fires (Counts 1-4), and two counts of use of fire to commit a felony, in violation of 18 U.S.C. §§ 844(h)(1) & (2) (Counts 5-6). Although DeCicco was eventually acquitted on the use-of-fire counts, he was convicted on the four mail fraud counts. He now appeals this conviction. After careful consideration, we affirm.

## I. Background

### A.

In August 1989, DeCicco bought a building located at 17 Rear Heard Street in Chelsea, Massachusetts for $60,000. Earlier that year, before buying the building, he had applied to the City of Chelsea ("Chelsea") for a permit to use the building as a warehouse for two moving companies that he owned. The building, however, was surrounded by residential buildings and had only a narrow driveway providing access. Chelsea therefore denied the appellant's application.

DeCicco nonetheless went ahead with the purchase. Although the building price was only $60,000, he obtained a loan of $104,000 from Somerset Bank, secured by a mortgage on the property. Notwithstanding the denial of the occupancy permit, DeCicco

-2-

initially tried to use the building as a warehouse. He was, however, prevented from doing so by Chelsea. As a result, he ended up with a significant mortgage on a building he could not use for the purpose he desired. By August 1991, he was in arrears on the mortgage, and Somerset Bank informed him that it was intending to initiate foreclosure proceedings. Moreover, the appellant had two other obligations to Somerset Bank by this time: a $400,000 loan used to build a new warehouse in Revere, Massachusetts ("Revere"), and a short-term, $80,000 commercial loan. The appellant was falling behind on the Revere loan as well.

In October 1991, DeCicco obtained insurance on the Rear Heard Street building from the Lincoln Insurance Company ("Lincoln"). However, he misrepresented that the premises were occupied, and after this fact was discovered upon inspection, Lincoln, on March 3, 1992, sent a cancellation notice by certified mail to the appellant. The notice advised the appellant that his insurance policy would be cancelled effective March 13, 1992 at 12:01 a.m.

Just twenty-nine hours before the insurance was to lapse, a fire occurred at the Rear Heard Street building. Investigators determined that the fire was intentionally set using a liquid accelerant at the base of the support pillars in a manner designed to bring the building down. The Fire Department responded quickly,

however, and such little damage occurred that the appellant did not file a claim.

Following the cancellation of the Lincoln policy, the Rear Heard Street building went for three years without insurance. At some point during this period, the appellant retained Richard Stewart ("Stewart"), an accountant, to help him prepare income tax returns for the years 1992, 1993, and 1994. In December 1994, Stewart informed the appellant that, based on the information available to him and the draft returns he had prepared, the appellant owed $1,246,298 in federal and state taxes and penalties for 1992, 1993, and 1994. The draft returns reflected some deductions for expenses, but they did not reflect deductions for such business expenses as payroll. Based on Stewart's training and experience, he estimated that the appellant's tax liability might have been reduced by as much as ninety percent if the appellant had documentation for these expenses.

Aside from his significant personal income tax liability, DeCicco also continued to have other financial issues during this period. He owed a total of $65,673.56 to Revere in property taxes. He was also in significant arrears on property taxes for the Rear Heard Street building in Chelsea. By July 1995, the amount he owed to Chelsea had ballooned to approximately $12,000. Finally, he still owed almost $95,000 to Somerset Bank in connection with the loan used to purchase the Rear Heard Street building, which was

-4-

essentially vacant, and which he was expressly forbidden to use in connection with his moving companies.

In May 1995, facing all of these financial pressures, DeCicco once again attempted to obtain insurance on the Rear Heard Street building. On May 17, 1995, the Scottsdale Insurance Company ("Scottsdale") issued the appellant an insurance policy providing coverage of up to $125,000 for the building.

Less than two months later, on July 9, 1995, the building was intentionally set on fire for a second time, with at least four separate fires started on the second floor of the warehouse. The Fire Department again responded quickly, and the fires were extinguished. However, twelve days later, on July 21, 1995, a third fire was intentionally set in the building in the early morning hours. This was a multiple-alarm fire, requiring Chelsea to call for aid from Revere, Everett, and Boston to fight the fire. It took approximately four hours to extinguish the blaze. In the end, the building was completely destroyed. The fire also damaged a neighboring garage; melted the siding on a nearby building; and destroyed the kitchen, bathroom, and pantry on the third floor of another building.

Given the extensive damage, Chelsea ordered the appellant to demolish what was left of the building. The appellant asked Kevin Mahoney ("Mahoney") to perform the work. Mahoney discussed the matter with his cousin, Randy Adamson, and then agreed to

demolish the building for $13,800, a price that the appellant accepted. Mahoney and Adamson, using helpers and equipment, demolished the building and removed the rubble in approximately six days. The appellant paid Mahoney with an initial check of $4,000 and then later paid the remaining $9,800.

DeCicco then sought the assistance of a public claims adjustor, Terence Lynn ("Lynn"), to assist in filing his claim with Scottsdale, to recover pursuant to the insurance policy for the destruction of the building. However, almost immediately a number of points of contention arose between the appellant and Scottsdale. In early September 1995, in a communication between Lynn and Scottsdale regarding the appellant's claim, an issue arose regarding whether the building was vacant at the time of the fire. This was important, because according to the terms of the Scottsdale policy, recovery for a fire loss could be reduced by fifteen percent if the building was vacant when the fire occurred. On September 19, 1995, as this issue regarding vacancy was pending, the appellant's insurance broker, Justin Kaan, faxed to Lynn a document signed by the appellant and purporting to set forth certain items that were in the warehouse at the time of the fire, including dollies, a piano, a desk, chairs, and a couch. Scottsdale's fire investigator, however, saw no evidence of dollies or a piano when he examined the remains of the building after the fire.

There were other controversies as well. On September 20, 1995, Lynn sent a letter to Scottsdale's representative, John Bottini ("Bottini"). Lynn wrote that "I have enclosed a copy of the wrecking bill in the amount of $23,681, which was performed as a result of an emergency raze or repair order issued by the municipality shortly after the occurrence of the loss." The enclosed demolition bill purported to bear the signature of Arthur Adamson. However, according to Mahoney, who actually did the demolition work with Randy Adamson, DeCicco only paid $13,800, the agreed-upon price for the work. Furthermore, both Randy Adamson and his mother stated that the signature on the demolition bill submitted to Bottini was not that of Arthur Adamson (who died in 1997), nor was the bill on his letterhead.

On October 17, 1995, Lynn mailed to Bottini another letter in which he again mentioned the $23,681 demolition bill. Included with this letter was the partial sworn statement in proof of loss referenced in Count 1 of the indictment and a request for an advance payment of $25,000. In an attempt to get Scottsdale to issue this advance payment, Lynn's letter stated, among other things: "We both know that Massachusetts is a so-called broad evidence rule state. The disagreements as to value and loss are still subject to indemnification of the insured whose indebtedness to the mortgagee as of this date of loss was $97,016.29 and who has incurred a wrecking bill of $23,681." Scottsdale thereafter

forwarded Lynn a $25,000 check -- the Count 2 mailing -- which Lynn sent to Somerset Bank, which was named as a loss payee because of its mortgage on the property.

On January 2, 1996, Lynn sent a letter to Bottini enclosing a proposed sworn statement in proof of loss seeking to achieve a final settlement of the losses and again noting, among other things, that "the incurred cost of wrecking the structure was $23,681 . . . ." Lynn also claimed in this letter that the appellant had made extensive renovations to the building, including installation of a hot air heating system, an electrical system, a two-piece bath, a new roof, skylights, and a $10,000 power lift. However, the appellant had told Bottini shortly after the fire that the warehouse had had neither heat nor electricity. Furthermore, Scottsdale's fire investigator saw no evidence of a power lift and noted that neither the heating system nor the electrical system had been operational at the time of the fire. Bottini was never provided with any documentation to support DeCicco's claimed improvements. He rejected the proposed proof of loss.

Bottini and Lynn eventually negotiated a settlement, and on February 7, 1996, Lynn sent Bottini a letter -- the Count 3 mailing -- containing a sworn proof of loss reflecting the settlement figures of $95,283 for the building and $23,681 for the demolition, for a total of $118,964. Bottini states that had he known that the actual cost of the demolition was less than $23,681,

he would not have agreed to the final settlement amount, and had Scottsdale been aware that the actual amount incurred was less, it would not have paid that amount. Bottini, however, acknowledged that $23,681 was a fair figure for the demolition, given the building's size.

On February 27, 1996, Scottsdale sent a check to Lynn in the amount of $91,964 -- the Count 4 mailing -- the settlement amount minus two $1,000 deductibles and the $25,000 advance payment. That check listed as payees DeCicco, Lynn, Somerset Bank, and Chelsea.[1] DeCicco took the check to a bank and deposited it. Although it appeared that the check had been endorsed by each of the payees, the endorsements of both Joseph Bianco on behalf of Somerset Bank and Alicia Silverberg on behalf of Chelsea were forged; indeed, no one named Alicia Silverberg had ever worked for the Chelsea City Treasurer's Office. Somerset Bank did ultimately receive insurance proceeds in the form of a Bank of Boston check from the appellant in the amount of $92,500, which satisfied the mortgage on the Rear Heard Street building in full. Bianco understood that this payment represented the Scottsdale insurance proceeds. Chelsea, however, never received payment for the real estate taxes.

---

[1] At the time of the fire, Chelsea was owed between $12,000 and $16,000 in real estate taxes. It had priority of payment from the insurance proceeds.

**B.**

On September 27, 2000, the grand jury sitting in Boston returned its indictment, charging the appellant with four counts of mail fraud, and two counts of use of fire to commit a felony. With respect to the four mail fraud counts, the indictment alleged in one paragraph (paragraph 5) that DeCicco caused the destruction of the warehouse by fire. It alleged in a separate paragraph (paragraph 4) that "following the damage by fire . . . [DeCicco] would and did cause the submission . . . of false and fraudulent claims for building loss insurance proceeds." The language of paragraph 4 does not make the alleged falsity of DeCicco's claims conditional upon any other acts on his part, nor does it specify that the claims were false for a certain reason. Paragraph 4 is therefore broad enough to support not just the theory that DeCicco's claims were fraudulent because he caused the fire, but also the theory that his claims were fraudulent for independent reasons, regardless of how the fire may have started. The other two counts, regarding use of fire to commit a felony, charged the appellant with violations of 18 U.S.C. §§ 844(h)(1) & (2) based on the fires that occurred at the Rear Heard Street building on July 9, 1995 and July 21, 1995.

On April 14, 2003, prior to trial, the district court granted the appellant's motion to exclude evidence, pursuant to Fed. R. Evid. 403 and 404(b), regarding (1) the March 1992 fire

that occurred at the same property involved in the indicted counts, and (2) testimony of Stewart, DeCicco's accountant, regarding DeCicco's income tax liabilities. The government appealed from this ruling, and this Court reversed the district court's exclusion of the evidence. See United States v. DeCicco, 370 F.3d 206 (1st Cir. 2004) ("DeCicco I").

The case proceeded to trial on November 8, 2004. One of the government's key witnesses was the accountant Stewart, who testified not only about the amount of DeCicco's tax liability -- the issue before this Court on the prior appeal -- but also about the fact that Stewart had sought additional documentation from DeCicco to support claimed deductions which would have reduced DeCicco's tax liability. DeCicco objected to this additional testimony by Stewart. The district court, however, ruled that the testimony was admissible.

At the conclusion of the government's evidence, DeCicco made a motion, pursuant to Fed. R. Crim. P. 29, that there was insufficient evidence for a reasonable jury to find him guilty beyond a reasonable doubt, particularly as to the use-of-fire counts. The district court granted the appellant's motion for a required finding of not guilty as to one of the counts charging the appellant with use of fire to commit a felony but denied the motion as to the mail fraud counts and the other count charging use of fire to commit a felony.

When the appellant put on his case, he called several witnesses, including Terence Lynn, the public claims adjustor, and Lawrence Maddeford, who lived next to the Rear Heard Street building. Maddeford observed that kids would hang out at the building all the time, breaking through the boarded-up windows to gain access. Despite Maddeford registering numerous complaints with the police, the building essentially became a clubhouse for the kids for several years. After the fire destroyed the building, that was the end of the clubhouse.

At the conclusion of DeCicco's case, he renewed his Rule 29 motion. The district court entertained argument on the issue again, noting that although it had denied the motion with respect to Count Six (the remaining use-of-fire count), it would "like the government's argument, in view of the fact there appears to be a witness [Maddeford] -- seems to me a very credible witness -- who raised a great doubt as to whether or not these what you call vagrants or kids constituted a nuisance did, in fact, cause the fire." After argument, the district court granted the appellant's motion for a required finding of not guilty as to the other count charging use of fire to commit a felony. The court also issued an order to the parties that they were not to argue to the jury during closing arguments that the appellant was, or was not, responsible for the fires.

On November 17, 2004, the jury found the appellant guilty on all four remaining mail fraud counts. The district court sentenced DeCicco to two years of probation, a $7,500 fine, and restitution of $9,881. It is this conviction that he appeals here.

## II. Constructive amendment and material variance claims

DeCicco's first claim is that there was a constructive amendment of his indictment, or alternatively, that there was a material variance between the indictment and proof that affected his substantial rights. In United States v. Fisher, 3 F.3d 456 (1st Cir. 1993), we described the difference between a "constructive amendment" and a "material variance":

> A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them. A variance occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment. A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction. Variance is grounds for reversal only if it affected the defendant's "substantial rights" -- i.e., the rights to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense.

Id. at 462-63 (internal quotation marks and citations omitted); see also United States v. Arcadipane, 41 F.3d 1, 6 (1st Cir. 1994) (variance requires reversal of a conviction "if it is both material and prejudicial").

-13-

## A.  Standard of review

In assessing DeCicco's "constructive amendment" and "material variance" claims, we must first determine the appropriate standard of review.  The appellant claims that because these issues were preserved through his objections at trial, de novo review is appropriate.  The government argues in opposition that the appellant made no such objections; as a result, we should review for "plain error."  See United States v. Olano, 507 U.S. 725, 731 (1993).[2]

In the district court, DeCicco twice moved for judgments of acquittal, arguing that there was insufficient evidence that he was responsible for the fires to permit the use-of-fire counts to go to the jury and that "the other counts are conditioned upon a finding of guilt on Counts 5 and 6 [the use-of-fire counts] in terms of using the fire to actually commit the . . . mail fraud counts . . . ."  At two different points -- both after the conclusion of the government's case and after the conclusion of the appellant's case -- the district court made apparent its disagreement with such a proposition, based on its assessment that DeCicco could be guilty of mail fraud, even if he were not responsible for the fires, if he simply took advantage of the fires by submitting an inflated bill for the demolition costs.

---

[2]  The appellant does concede that if de novo review does not apply, "plain error" is the proper standard of review.

-14-

Nevertheless, DeCicco argues here that these motions sufficed to preserve his objection that the district court would be constructively amending the indictment if it allowed him to be tried for a scheme to defraud other than the one charged in the indictment, namely, a scheme to cause the destruction of the Rear Heard Street building by fire in order to fraudulently claim insurance proceeds for the loss of the building. He also states that these motions were sufficient to preserve his objection that the district court was effecting a material variance between indictment and proof that affected his substantial rights.

We fail to see, however, how the motions cited by DeCicco can be deemed "constructive amendment" or "material variance" objections. Despite his attempt to spin them that way, the arguments he made in support of his motions were merely an articulation of his view that no charges would survive if the district court granted the motions, particularly with regard to the use-of-fire counts. Moreover, after the district court clearly stated its belief -- twice -- that the indictment comprehended the theory that the appellant had taken advantage of the fires by submitting false insurance claims, the appellant interposed no objection or argument that this would constitute a "constructive amendment" of the indictment or a "material variance" between indictment and proof. Under Fed. R. Crim. P. 51(b), a party may preserve a claim of error by informing the court -- when the court

-15-

ruling or order is made or sought -- of the party's objection to the court's action and the grounds for that objection. Here, however, the appellant took no such action.[3]

In light of these facts, we believe that DeCicco did not preserve his objections and that the "plain error" test should apply in this instance. Under this standard, there must have been an error, the error must have been "plain," and the error must have affected the substantial rights of the appellant. See Olano, 507 U.S. at 732. If all three elements are satisfied, we have the authority to order correction of the error, but we are not required to do so. Id. at 735. We exercise this discretion only where the plain error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. at 736 (internal citation and quotation marks omitted).

## B. Constructive amendment

The appellant makes two separate "constructive amendment" claims. First, he reads the indictment to include one theory and one theory only: that he had devised a scheme to submit insurance

---

[3] In his reply brief, the appellant admits as much. He concedes that his trial counsel did not use the term "constructive amendment." He also notes that when he responded "Okay" after the district court had handed down its ruling that there could still be a mail fraud even absent the use-of-fire counts, he was simply acknowledging the court's position, not acquiescing in its correctness. This may be true, but however he characterizes his response, it was not sufficient to preserve his claim of error under the standard in Fed. R. Crim. P. 51(b). In the end, as we shall discuss, even had counsel preserved the objection, there was no error.

-16-

claims to Scottsdale which were false and fraudulent <u>because he caused the fires</u> (i.e., as the one who started the fires, he was not entitled to any recovery).  However, he notes that after the district court ruled that the government had presented insufficient evidence that DeCicco was responsible for the fires, the government shifted its theory in its closing arguments to discuss how the appellant had devised a scheme to submit insurance claims to Scottsdale which were false and fraudulent <u>for reasons entirely independent of whether he caused the fires</u>. When the government made this shift, he argues, it impermissibly broadened the possible bases for conviction beyond those set forth in the indictment returned by the grand jury.  This shift in theory, from one in which DeCicco's responsibility for the fires was an essential component of the fraudulent scheme to one in which it was unnecessary, constituted a constructive amendment of the indictment in violation of the Fifth Amendment Grand Jury clause.  This shift broadened the scheme charged in the indictment because it permitted his conviction to rest on claims for insurance proceeds which were fraudulent for <u>any</u> reason, not just because DeCicco was responsible for the fires.

The appellant, however, misreads the indictment. He is incorrect in maintaining that the indictment did not encompass claims for insurance proceeds that were fraudulent for reasons other than that he had caused the fires.  The indictment alleged,

-17-

in two separate and distinct paragraphs, two separate and distinct ways in which the appellant perpetrated mail fraud: (1) by causing the submission to Scottsdale of false and fraudulent claims for building loss insurance proceeds, and (2) by actually causing the damage to and destruction of the Rear Heard Street building by fire. In other words, the indictment contained two completely separate theories. In the first theory, DeCicco committed mail fraud because he submitted false and fraudulent claims for insurance proceeds after the fire, however it may have started. In the second theory, the appellant committed mail fraud for a different reason. The claims that he submitted were false and fraudulent because he caused the fire (and therefore was not entitled to any recovery).

Accordingly, the mail fraud counts of the indictment were not dependent on the theory that the appellant had caused the fires. Instead, they were so fashioned as to comprehend that one could take advantage of a fire and commit mail fraud even without having caused the fire. In other words, the appellant's misrepresentations -- for example, in the fraudulent demolition bill or in the phony list of property in the warehouse at the time of the fire or in the letter sent by Lynn to Bottini listing improvements made to the property by DeCicco -- could be used to show he committed mail fraud, regardless of whether he started the fires. As such, when the government made the shift complained of

by the appellant, the government was not exceeding the scope of the indictment but was merely operating with its confines.

Both parties point to the Supreme Court's decision in United States v. Miller, 471 U.S. 130 (1985), to support their respective positions. We think Miller clearly shows that there was no "constructive amendment" in this case. In Miller, the defendant was convicted of two counts of mail fraud, in violation of 18 U.S.C. § 1341. The indictment in the case alleged a scheme to defraud with two distinct components; specifically, the indictment alleged both that the defendant had defrauded his insurer by consenting to a burglary in advance and by then lying to the insurer regarding the amount of copper wire which was stolen during that burglary. The trial evidence, however, went only to the allegation that the defendant had lied regarding his copper-wire claim. The government moved to strike the portion of the indictment that alleged the defendant's pre-knowledge of the burglary, but, when the defendant opposed that motion, the entire indictment went to the jury. The defendant was convicted, and on appeal, complained that both prongs of his indictment were not satisfied.

The Supreme Court affirmed Miller's conviction, finding that the pre-knowledge of the burglary in Miller's indictment constituted a segregable component of the charged scheme to defraud, and that the evidence presented regarding the inflated

-19-

copper-wire claim was sufficient to support a conviction. The Court noted that nothing new was added to the grand jury's indictment and that "Miller was tried on an indictment that clearly set out the offense for which he was ultimately convicted." Miller, 471 U.S. at 140.

In the present case, the indictment similarly contains two distinct and segregable components. As we have demonstrated above, and contrary to the appellant's assertion that the indictment in this case "did not specify any separable, independently fraudulent scheme on which conviction based on a narrower scheme than that charged in the indictment might validly rest," the indictment at issue here alleged two separate and distinct ways in which the appellant perpetrated mail fraud, neither of which was dependent on the other. And just as in Miller, where the removal of the allegation of complicity in the burglary resulted in a permissible narrowing of the indictment, leaving intact the theory that the defendant had submitted inflated insurance claims, so too could the deletion of the allegation of complicity in the fires here result in a permissible narrowing of the indictment, leaving intact the separate theory that the appellant had submitted claims that were false and fraudulent for reasons unrelated to whether he had started the fires.

DeCicco's second "constructive amendment" claim is as follows: The indictment charged him with submitting false and

fraudulent claims for <u>building loss</u> insurance proceeds, but the centerpiece of the government's argument to the jury urging it to convict DeCicco of mail fraud was not a false and fraudulent claim for <u>building loss</u> insurance proceeds at all -- it was a claim for reimbursement for <u>demolition</u> expenses which the government contended was falsely inflated. DeCicco supports his argument by pointing to how the Scottsdale insurance settlement had two independent components: one amount for the loss of the building, and another amount for the demolition costs. The two were completely separate. He similarly notes how the Scottsdale policy expressly differentiates between building loss and debris removal. In his eyes, the government's reliance on the demolition bill created the strong possibility that he was convicted of an offense other than that charged by the grand jury. This, therefore, constituted a constructive amendment of the indictment.

We, however, do not find this argument convincing. The indictment is not tied to any particular provision of the settlement agreement or the Scottsdale policy. As a result, we believe that the grand jury, when issuing its indictment, was speaking generically about "building loss" and was not using the specific definition of that phrase as provided for in the settlement agreement or the Scottsdale policy. We also think it inconceivable that the grand jury in this instance would issue an indictment limited only to "building loss" proceeds, as that term

was used in the settlement agreement or the Scottsdale policy, when there was ample evidence that the appellant had also submitted false and fraudulent claims relating to "demolition" or "debris removal" expenses, as those terms were used in the settlement agreement and the Scottsdale policy.

We find, therefore, that there was no "constructive amendment" of the indictment in this instance. Since there was no error, appellant cannot possibly satisfy the "plain error" standard.

## C. Material variance

Even if there was no constructive amendment, the appellant argues that there was, at a minimum, a material variance between indictment and proof. In this iteration of his argument, appellant concedes that the charging terms of the indictment are not in dispute. However, he claims that the facts proved at trial were different from those alleged in the indictment. In his view, the indictment alleged facts relating to one theory -- namely, that his insurance claims were false and fraudulent because he had caused the fires to occur. The facts presented at trial, however, related to another theory -- that his insurance claims were false and fraudulent because he had submitted false documentation in support of his claims. This was a variance, and it was one that affected his "substantial rights" in two ways: 1) he had insufficient notice to be able to prepare an effective defense to

-22-

the new theory which the government argued to the jury; and 2) he was prejudiced by the continuing use of evidence which had been admitted solely because it was relevant to the use-of-fire counts.[4]

This claim, however, fails at its foundation. Once again, the appellant misconstrues the indictment. As we related above, the indictment clearly comprehended the theory that DeCicco's insurance claims were false and fraudulent for reasons unrelated to whether he had caused the fires. In particular, they were false and fraudulent because he had submitted false documentation in support of his claims. The sworn statements in proof of loss and the insurance settlement checks discussed in the indictment clearly related to this theory. Moreover, the facts that were presented at trial related to this theory. For example, facts were presented that he had provided a false demolition bill, that he had provided a phony list of property in the warehouse at the time of the fire, and that he had falsely listed improvements made to the property in the letter sent to Bottini. These falsities all led to the fraudulent sworn statements in proof of

---

[4] As the government correctly points out, this second argument is not an argument that the appellant purportedly was prejudiced by a variance, but rather an argument that he was prejudiced by the admission of certain evidence. However, prejudice resulting from the admission of certain evidence is not what was meant by compromising "substantial rights" in the "material variance" context. See United States v. Tormos-Vega, 959 F.2d 1103, 1115 (1st Cir. 1992) ("Substantial rights" refers to the rights of a defendant to "have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense.").

loss referenced in the indictment and were what prompted the insurance settlement checks sent by Scottsdale that were also referenced in the indictment. Thus, the facts proved at trial were not different from those alleged in the indictment, and there was no variance. Since there was no variance, we do not reach the question of whether such an alleged variance was material or whether the appellant's substantial rights were affected.

### III.  Potential violation of the district court's order

The appellant next argues that the government committed reversible misconduct in its closing arguments to the jury. Before the closing arguments commenced, the district court instructed the parties that they were not to argue to the jury that DeCicco was, or was not, responsible for the fires. The appellant here argues that the government violated this order when it explicitly argued to the jury that DeCicco had a motive to want the building gone. Such an argument, contends the appellant, the jury could only have interpreted as suggesting DeCicco's responsibility for the fires. Appellant, in particular, points to the following statements by the government during closing arguments:

> Now finally, there was this argument that the defendant got nothing out of this. I suggest to you, just use your common sense. You've got a building that's useless. You've got a building that people are chasing you after. You've got a building where your tax liabilities for the property are ballooning as time goes on. And you owe the bank a lot of money. . . .

-24-

> This defendant had every incentive to want that building gone, to be rid of that building. And by getting [Scottsdale] to get him off the hook and basically pay the entire mortgage, everything that was due and owing to the bank on that, as well as everything he had to pay to Kevin Mahoney and Randy Adamson to take the building down, you can't say that the defendant got nothing. He got the entire benefit of that. He got completely free and clear of that horrible investment that he made for whatever reason back in 1989.

Trial Tr. 5-93-94 (emphasis added). This argument, the appellant argues, was highly prejudicial and warrants reversal of his conviction.

On this issue, the appropriate standard of review is clear. Because DeCicco did not object to the government's closing arguments, we review for plain error. See Olano, 507 U.S. at 732.

After reviewing the record, we do not believe that the government violated the district court's order when it stated that the appellant "had every incentive to want that building gone, to be rid of that building." For several reasons, we think that in making such a statement, the government was addressing the appellant's desire to have the building gone in an economic sense (as in "gone from his portfolio"). We also think this is how a jury would have understood such a statement.

First, and most importantly, we look at the context in which these words were uttered. At the time the government made the statement at issue here, it was discussing the nature of appellant's investments, tax liabilities, and mortgages. The

-25-

government was not discussing any allegations that the appellant was responsible for the fires. The context of the government's statement leads us to believe that the government desired only to discuss how the appellant sought to maximize his recovery from Scottsdale and rid himself entirely of a horrible investment through the submission of false claims. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 466 (2001) ("Words that can have more than one meaning are given content, however, by their surroundings."); California v. Brown, 479 U.S. 538, 543 (1987) (discussing the relevance of the noscitur a sociis canon -- which literally means "it is known from its associates" and instructs that "the meaning of an unclear word or phrase should be determined by the words immediately surrounding it" -- in assessing the validity of a jury instruction); Neal v. Clark, 95 U.S. 704, 708-09 (1878) ("copulatio verborum indicat acceptationem in eodem sensu -- the coupling of words together shows that they are to be understood in the same sense. And where the meaning of any particular word is doubtful or obscure, . . . the intention of the party who has made use of it may frequently be ascertained and carried unto effect by looking at the adjoining words." (citing Broom's Legal Maxims, p. 450)).

We also read the government's statement as a response to the appellant's earlier comment that he had gained nothing from the alleged fraud. Appellant's counsel had stated:

-26-

> I just want to point out to you again what I've said all along. When you're out there deliberating, remember, Gary got nothing out of this. It cost Gary money out of his pocket. Gary lost an asset, a building, that although it was tough to get to, was described as the triple-thick walls, huge beams, a good, solid building he had and he lost. Gary had no reason -- there was no rhyme, no reason for Gary to do anything.

Trial Tr. 5-89. The government's statement was an attempt to address this argument. In stating that the appellant "had every incentive to want that building gone, to be rid of that building," the government was attempting to counter the appellant's argument and show that the appellant did indeed reap a benefit from the alleged mail fraud. The complained-of statement addressed the appellant's motive in committing the fraud -- namely his desire to have a troublesome financial investment removed from his portfolio by having Scottsdale pay off his mortgage and the entire cost of demolition.

We therefore find that the government did not violate the district court's order to refrain from discussing the appellant's responsibility for the fires. Once again, the appellant fails to show the error required under the "plain error" test.

### IV.  The accountant's testimony

DeCicco's final argument is that the district court erred in admitting the testimony of his accountant Stewart regarding his (DeCicco's) missing expense documentation. We review the admission of evidence under Fed. R. Evid. 404(b) for abuse of discretion.

United States v. Smith, 292 F.3d 90, 98 (1st Cir. 2002). "[A]n abuse of discretion occurs when a relevant factor deserving significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." United States v. Gilbert, 229 F.3d 15, 21 (1st Cir. 2000) (citing United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992) (internal quotation marks omitted)).

In DeCicco I, we held that the district court abused its discretion in excluding the testimony of DeCicco's accountant, Richard Stewart, regarding DeCicco's outstanding income tax liabilities, concluding that it was relevant to DeCicco's motive to commit arson and mail fraud and, hence, admissible under Fed. R. Evid. 404(b). We also found that the evidence was not excludable under Fed. R. Evid. 403, because "when offered for the limited purpose of showing motive, and viewed in the context of the government's charges, any danger of unfair prejudice in this case is minimal." DeCicco, 370 F.3d at 214.

When Stewart's testimony was offered at trial, the government informed the district court that it intended to elicit from Stewart not just the amount of tax liability which he had calculated -- the issue before this Court in DeCicco I -- but also that Stewart had sought additional documentation from DeCicco to

support claimed deductions which would have reduced DeCicco's tax liability to about ten percent of what Stewart had calculated.  The appellant objected to this additional testimony by Stewart.  The district court, however, ruled that the testimony was admissible because this Court said that it was.

Appellant contests this ruling, noting that although this Court has ruled that Stewart's testimony regarding DeCicco's tax liabilities was admissible under Fed. R. Evid. 404(b), the question of Stewart's testimony regarding DeCicco's failure to provide him with documentation supporting expenses he claimed as deductions was not before the Court.  Contrary to the district court's position, appellant argues that this Court's decision in DeCicco I did not require it to admit this portion of Stewart's testimony.

We believe that the district court made the correct decision in admitting the evidence.  Federal Rule of Evidence 404(b) provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake . . . .

Fed. R. Evid. 404(b).  Therefore, as we noted in DeCicco I, "mere propensity evidence is never admissible solely to show a character inclined towards unlawful behavior.  The same evidence may be admissible, however, even if it may be construed as propensity

evidence, if it is used to show any of the other elements set out in the rule." DeCicco, 370 F.3d at 210-11 (citations omitted).

We use a two-part test to evaluate the admissibility of evidence under Rule 404(b). First, we must determine whether the evidence in question has any "special relevance" exclusive of defendant's character or propensity. See United States v. Sebaggala, 256 F.3d 59, 67 (1st Cir. 2001) (the proffered evidence "must not merely show a defendant's reprehensible character or predisposition toward knavery . . . ."). Second, even if some "special relevance" is found, the evidence must nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. "Rule 404(b) incorporates sub silentio the prophylaxis of Federal Rule of Evidence 403." Id.

Regarding the first prong of the test, the appellant argues that "Stewart's testimony regarding DeCicco's failure to provide him with the documentation necessary to reduce his tax liability by 90% was not relevant to the question of DeCicco's motive to commit arson or mail fraud, nor did the government ever articulate a basis for its admissibility under Rule 404(b)." He states that this was evidence which the jury would have used purely for propensity purposes. In his eyes, the jury would draw only two conclusions from this evidence: (1) that DeCicco had misrepresented his business expenses to Stewart in hopes of limiting his tax liability, and (2) that his businesses must have been conducted

dishonestly if he could not produce even something so routine as payroll records. Thus, the jury would have reasoned that because DeCicco had attempted to defraud the federal and state taxing authorities and because he must have been conducting his businesses in a dishonest manner, as evidenced by the lack of even the most routine recordkeeping, he was more likely to have perpetrated a fraud on Scottsdale. As such, he argues, this evidence was pure propensity evidence and should not have been admitted under the first prong of Rule 404(b).

We, however, believe that Stewart's testimony relating to the missing expense documentation contained a "special relevance" exclusive of DeCicco's character and propensity. In particular, such testimony was relevant to DeCicco's motive for committing the charged mail fraud offenses.

In DeCicco I, we came to a similar conclusion when we stated that Stewart's testimony relating to DeCicco's tax liabilities could be used "in order to show for what purpose the fraudulently obtained insurance proceeds were intended" -- i.e., to show that the money obtained from Scottsdale would be used to defray DeCicco's tax liabilities. DeCicco, 370 F.3d at 214. In this appeal, we find that Stewart's testimony relating to the missing expense documentation also related to DeCicco's motive, but in a different way. In his opening, DeCicco had argued that he had to have been making a lot of money to generate such large tax

liabilities and therefore had no motive to commit the charged fraud. Stewart's testimony relating to the missing expense documentation helped provide a response to this contention. It was used to show that the appellant's net income was likely significantly less than the available documentation suggested and that the appellant likely did not have money on hand to pay what he owed. Thus, Stewart's testimony helped the government demonstrate that DeCicco did indeed have a motive to fraudulently obtain insurance proceeds from Scottsdale -- i.e., the alleged mail fraud provided him with the funds he needed to pay his debts.[5]

The appellant also argues that Stewart's testimony should be excluded under Fed. R. Evid. 403, which is incorporated into the second prong of the Rule 404(b) test, because any probative value which Stewart's testimony had was substantially outweighed by the effect of unfair prejudice. However, this argument fails as well, because, as we stated in DeCicco I, "we are of the view that, when

---

[5] In other words, Stewart's testimony about DeCicco's missing expense documentation was used to show that DeCicco was not as wealthy as he claimed. The fact that DeCicco could not produce documentation to support some of his claimed expenses could lead one to believe that perhaps DeCicco had expenses that were "off the books." For example, perhaps he paid certain employees with cash in order to avoid payroll taxes. If this was the case and DeCicco did in fact have a number of additional expenses beyond those that were covered in his documentation, his net income would have been less than he had claimed it was. And if his net income was less than he claimed it was, he would have had difficulty paying off his debts. Thus, DeCicco did indeed have a motive to commit mail fraud. Such a fraud would have provided him with extra funds to pay off his income taxes, his property taxes, and his mortgages and commercial loans.

offered for the limited purpose of showing motive, and viewed in the context of the government's charges, any danger of unfair prejudice in this case is minimal." <u>DeCicco</u>, 370 F.3d at 214. We continue to hold this belief, and it is fatal to DeCicco's claim here. Accordingly, we find that the district court did not abuse its discretion in admitting Stewart's testimony about DeCicco's missing expense documentation.

## V. Conclusion

For the reasons stated above, we affirm the judgment of the district court.

**<u>Affirmed</u>**.