# United States Court of Appeals
## For the First Circuit

No. 05-1718

UNITED STATES OF AMERICA,

Appellee,

v.

DIEGO ORTIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel,  U.S. District Judge]

Before

Howard, Circuit Judge,
Coffin and Campbell, Senior Circuit Judges.

    Jeanne M. Kempthorne, by Appointment of the Court, for
appellant.
    David G. Tobin, Assistant U.S. Attorney, with whom Michael J.
Sullivan, United States Attorney, was on brief for appellee.

May 3, 2006

**COFFIN, <u>Senior Circuit Judge</u>.** Appellant Diego Ortiz claims that he unknowingly got caught up in a drug deal when he agreed to drive an acquaintance around town for a few hours. He was indicted along with his passenger and a third individual, but was tried alone after the other two entered pleas. A jury found Ortiz guilty on one count of conspiracy and one count of possession, both with the intent to distribute more than five kilograms of cocaine. <u>See</u> 21 U.S.C. §§ 846, 841(a)(1). On appeal, he challenges the sufficiency of the evidence and also claims that the prosecutor's improper closing argument severely prejudiced his case. He further asserts that the district court erred in imposing a ten-year mandatory term of imprisonment. We affirm both his conviction and his sentence.

## I. <u>Background</u>

The facts presented at trial, taken in the light most favorable to the prosecution's case, are as follows. <u>See</u> <u>United States</u> v. <u>Llinas</u>, 373 F.3d 26, 28 (1st Cir. 2004).

In the mid-afternoon of February 13, 2004, an undercover Massachusetts State Trooper, Jaime Collazo, and a cooperating witness, Raphael Tejeda, met in East Boston with Victor Sosa, the target of an investigation by the Drug Enforcement Administration (DEA), to discuss a purchase of five kilograms of cocaine. Sosa, who had sold Collazo 100 grams of heroin two weeks earlier, said

the cocaine transaction would have to wait until later in the day, when he could get the drugs from his friend.

Sosa remained in regular telephone contact with Collazo and Tejeda, and they eventually arranged to meet up again at a Kentucky Fried Chicken in Everett, Massachusetts. In the interim, appellant Ortiz had become Sosa's driver,[1] and the phone calls from Sosa to Collazo after 5:30 p.m. were made on Ortiz's cell phone. Sosa told Collazo that his phone had run out of minutes. Neither Collazo nor the cooperating source, Tejeda, had encountered Ortiz in prior dealings with Sosa.

At about 6:30 p.m., Sosa and Ortiz, traveling in Ortiz's car, drove up beside the car in which Collazo and Tejeda were waiting in the Kentucky Fried Chicken parking lot, and then Ortiz pulled back out and drove away with Collazo and Tejeda following. At some point, Collazo called Sosa and asked him to stop so they could talk. Both cars pulled over, and Sosa got out of Ortiz's car to speak with Collazo, out of Ortiz's hearing. Although the plan they devised called for Collazo and Tejeda to follow Sosa to his apartment, Collazo became concerned about a possible ambush and stopped following after a while.

---

[1] Ortiz testified that he ran into Sosa at a barber shop late in the afternoon and that Sosa asked for a ride to his house. After driving to Sosa's apartment and having a beer there, Ortiz said he agreed to drive Sosa to the Kentucky Fried Chicken.

Two phone calls between the cars, in which the parties discussed whether and how to consummate the deal, then occurred. Only the undercover agents' end of the conversation was recorded, so no voice identification could be made of the individual who was speaking. Although the defense and prosecution agree that the calls were made using Ortiz's phone, their debate is whether Ortiz participated in either conversation. Collazo testified that it was not Sosa in either instance; Collazo knew his voice and had had multiple telephone conversations with him earlier in the day. Collazo's testimony led inevitably to an inference that Ortiz had been on the phone discussing resumption of the drug deal. Ortiz testified, however, that he never conversed with Collazo. Moreover, he argues that the evidence shows that Tejeda, who did not testify, received the first of the two pertinent calls – undermining Collazo's testimony about that call. In addition, he asserts that the taped content of the second call, in which Collazo refers to meeting at "your house," makes it implausible that Collazo was talking to Ortiz, given that the plan had been to rendezvous at Sosa's house.

Ultimately, the parties agreed to meet at a Stop & Shop. According to the plan, Collazo would arrive alone and would call Tejeda to bring the money once he saw the cocaine. Sosa and Ortiz arrived after Collazo, and Ortiz parked his car trunk-to-trunk beside Collazo's. Ortiz remained in the driver's seat while Sosa

and Collazo met between the trunks of the two vehicles. Collazo noticed another man, later identified as co-defendant Alex Perez, sitting in a third car that was parked parallel to Ortiz's. When Sosa tapped on Ortiz's trunk, Ortiz popped it open using a latch inside the car. Sosa showed Collazo the cocaine, which was in a blue gym bag, and Collazo then alerted waiting law enforcement agents to arrest Sosa and the other two men.

As police officers and agents converged on the parking lot, Ortiz drove off. A few minutes later, he ran away from the car, leaving it unparked and rolling. With a state trooper's siren sounding, the officers, some shouting "police," pursued, apprehended and arrested him. Ortiz stated, "What happened? What happened? I'm a United States citizen," and also told the arresting officers he was "just the driver. The other guy was doing the deal."

At the police station, after waiving his <u>Miranda</u> rights, Ortiz was asked if he knew what Sosa did for a living. Detective Joseph Gallarelli testified that Ortiz replied, sarcastically, "Officer, please." Later in the interrogation, Ortiz said that he did not know Sosa's profession and did not know Perez. He admitted that he let Sosa use his cell phone and that he had given rides to Sosa before. He also told Gallarelli that he had given rides in the past to others he believed were drug dealers.

An inventory search of Ortiz's car turned up small amounts of marijuana and cocaine in the glove compartment, which Ortiz admitted were his. The blue bag that had been in the car's trunk contained 5.02 kilograms of cocaine.

Testifying in his own defense, Ortiz admitted seeing Sosa put the blue gym bag in his trunk but said he never saw the contents and did not know what was in it. He explained that he fled the Stop & Shop parking lot because he was frightened and initially neither heard the police siren nor saw the "DEA" or "Boston Police" labels on the officers' jackets. He said that he had agreed to drive Sosa around because he was not working at the time and had nothing to do. He acknowledged answering the phone once while driving Sosa around and said that he told the caller to hold on and then handed the phone to Sosa.

In rebuttal, the prosecution introduced the testimony of Perez, who described bringing the cocaine to Sosa's apartment. He corroborated Ortiz's testimony that they did not know each other and that Ortiz was not in the room when Perez gave Sosa the cocaine. Perez assisted the government's case, however, by testifying that he neither used Sosa's or Ortiz's cell phones on the day of the arrest nor spoke with Collazo or Tejeda that day, reinforcing the inference that Ortiz's was the unfamiliar voice Collazo heard on the phone.

At the end of the government's case-in-chief and again at the end of the trial, Ortiz moved for judgment of acquittal, arguing that the evidence was insufficient to prove his knowing participation in either the conspiracy or possession. The court reserved its ruling and ultimately allowed the jury's verdict to stand. On appeal, Ortiz again argues that the evidence was insufficient to support conviction, and he contends that the prosecutor's flawed closing argument unfairly impacted the jury's deliberations. He also challenges the sentence imposed. We begin by discussing the sufficiency of the evidence, saving the details of the closing argument and sentencing claims for our discussion of those issues in Sections III and IV.

## II. <u>Sufficiency of the Evidence</u>

When a judge expressly reserves decision on a motion for acquittal under Fed. R. Crim. P. 29(a), "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b); <u>see</u> <u>United States</u> v. <u>Moran</u>, 312 F.3d 480, 487-88 (1st Cir. 2002). Our review, which is <u>de novo</u>, is similarly limited. <u>Id.</u>; <u>United States</u> v. <u>Finn</u>, 375 F.3d 1033, 1037, 1039 (10th Cir. 2004); <u>United States</u> v. <u>Wahl</u>, 290 F.3d 370, 374-75 (D.C. Cir. 2002). We therefore consider only the evidence presented in the government's case-in-chief to assess whether "'a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the

crime,'" Moran, 312 F.3d at 487 (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).

In so doing, we take all inferences in the light most favorable to the verdict, we give equal weight to both direct and circumstantial evidence, and we neither weigh witness credibility nor require the prosecution to "'eliminat[e] every possible theory consistent with the defendant's innocence,'" United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir. 2001) (citation omitted). See also United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006); United States v. O'Shea, 426 F.3d 475, 479 (1st Cir. 2005). "[A]s long as the guilty verdict finds support in a 'plausible rendition of the record,' it must stand." Moran, 312 F.3d at 487 (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).

It is a rare appellant who can mount a successful sufficiency attack in the face of these principles, see O'Shea, 426 F.3d at 479, and Ortiz has not managed to so distinguish himself. While he raises intelligent challenges to multiple pieces of evidence, he is unable to offset the tilt in favor of the jury's judgment. Cumulatively, as we shall describe, the evidence and the inferences reasonably drawn from it allowed the jury to find him guilty on both counts.

To prove a defendant guilty of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary

participation. United States v. Nelson-Rodriguez, 319 F.3d 12, 27-28 (1st Cir. 2003); see also United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005). "'Mere association'" with conspirators or "'mere presence'" during conduct that is part of the conspiracy is insufficient to establish knowing participation, Nelson-Rodriguez, 319 F.3d at 28; the defendant must be found to have shared his co-conspirators' intent to commit the substantive offense, Llinas, 373 F.3d at 30. The substantive count, which was charged under the aiding and abetting statute as well, see 18 U.S.C. § 2, required proof of essentially the same state of mind, i.e., Ortiz's intent to help Sosa effectuate the cocaine deal. See United States v. Henderson, 320 F.3d 92, 109 (1st Cir. 2003).

The evidence, viewed in the government's favor, was more than ample to support the verdict. It is undisputed that Ortiz spent several hours in the late afternoon and early evening on the day of the deal driving Sosa from location to location, making one stop to rendezvous with Collazo and Tejeda in the Kentucky Fried Chicken parking lot and another stop to allow Sosa to converse with Collazo. Multiple phone calls were exchanged between the occupants of the two vehicles. Even if the encounter started out simply as a request from Sosa for a ride, given the length of time they spent together, the phone calls in Ortiz's presence, and Sosa's placing the blue gym bag in the trunk of Ortiz's car, a jury reasonably could suspect that Ortiz had become aware of the nature of Sosa's

business at some point before the meeting at Stop & Shop and become a willing accomplice in the transaction. Significantly, Ortiz was not a novice with respect to drugs; he admitted to police that the marijuana and cocaine found in his glove compartment were his own, suggesting a familiarity with the methodology of drug deals.

Collazo's testimony about his phone conversations with someone other than Sosa – in essence, testimony that he spoke with Ortiz – furthered the transformation of Ortiz from possible bystander to knowing collaborator. That characterization was reinforced by Ortiz's flight and his post-arrest statement that "[t]he other guy was doing the deal," both reasonably viewed as efforts to distance himself from a crime he knew about and assisted but considered Sosa's responsibility. Other evidence, while independently less inculpatory, also supported a finding that Ortiz willingly participated in the attempted transaction: that he pulled in beside Collazo and Tejeda's car trunk-to-trunk at Stop & Shop; that he immediately opened the trunk at Sosa's bidding; that he allowed Sosa to use his cell phone repeatedly to call Collazo and Perez.

Appellant seeks in his brief to diminish the force of the government's evidence by pointing to innocent explanations. Sosa always needed a ride, and Ortiz was unemployed, so his lengthy engagement as Sosa's driver was unremarkable. Ortiz claims that he fled the scene when the police arrived because he didn't realize at first that they were law enforcement officers, and he feared for

-10-

his safety. He asserts that his first excited statements – "What happened? What happened? I'm a U.S. citizen. I didn't do nothing wrong." – reflect confusion and innocence, not consciousness of guilt. Indeed, he points out that, once it became clear that he had been caught in a drug deal, he cooperated with the officers and gave a full account of his travels with Sosa. Although he concedes that the evidence shows that he knew what was going on by the time he was arrested, he asserts that there was no evidence of knowledge before that time. The officers had never previously seen him during surveillance of Sosa, and there was no evidence that he played a role in this transaction before he turned up as Sosa's driver.

On each of these points, however, the possibility of innocuous explanations for his behavior does not foreclose the jury's contrary inferences. See United States v. Hughes, 211 F.3d 676, 681 (1st Cir. 2000) (citation omitted) ("[T]he jury is generally 'at liberty to select freely among a variety of reasonable constructions of the evidence.'"). On the excited utterances, for example, Ortiz's assertion that he did nothing wrong could simply reflect his belief that driving someone else to transact that person's drug deal is not illegal.

Appellant similarly challenges the strength of the evidence on the phone conversations that Collazo testified were with someone other than Sosa, and we grant that the pertinent testimony was

confusing. At one point on direct examination, Collazo appeared to testify that someone other than Sosa was involved in three separate phone conversations, while his testimony on cross-examination referred explicitly only to one. In their briefs, the parties focus on two calls. Appellant argues that Collazo's testimony about the unfamiliar voice he heard on the first of these calls was entirely discredited on cross-examination when Collazo admitted that it was Tejeda, not Collazo, who was on the phone that time. The transcript, however, reveals that, while Tejeda answered the phone and initially relayed Collazo's words to the caller, Tejeda ultimately said "[y]ou talk to him." The next bit of dialogue may reflect Collazo talking directly to the caller – or so the jury reasonably could have found.

While there is no direct evidence that Collazo received a response to his comments – and thus heard the caller's voice at that time – such an inference would have been reasonable based on Collazo's testimony that he heard the "other" voice more than once. But however opaque the testimony about the earlier call, Ortiz was implicated by Collazo's unequivocal testimony that it was not Sosa with whom he spoke on the second call. Ortiz, however, argues that the content of the second call – referring to "your house" and noting Collazo's past demonstration that he was serious about the deal – makes it clear that Collazo must have been speaking with Sosa; it was Sosa's house to which they had been heading to

-12-

consummate the transaction, and it was Sosa with whom Collazo had been negotiating.

Although Ortiz's logic is rational, his view is again not the only possible interpretation of the conversation. Collazo knew that Sosa was using someone else's phone and traveling as a passenger in someone else's car, and it is quite plausible that, perceiving Ortiz and Sosa to be partners, he would make no distinction between them in framing his comments. To the extent such an inference depends upon the credibility of Collazo's repeated assurance that the second caller was not Sosa, the judgment was the jury's to make.

We thus acknowledge that plausible competing inferences exist and concede that, even from the government's perspective, the evidence, which was entirely circumstantial, shows only limited involvement by Ortiz. But competing inferences are not enough to disturb the jury's verdict, and limited involvement is nonetheless involvement. When the pieces of evidence are layered, with inferences taken in the government's favor, this is not a case in equipoise; a jury easily could find that Ortiz, while perhaps brought into the conspiracy on the spur of the moment because he had a car and was available, was a willing participant at the critical time. We therefore conclude that the evidence was sufficient to support the jury's finding of guilt beyond a reasonable doubt.

### III. Prosecution's Closing Argument

Ortiz argues that his conviction should be reversed because the government's closing argument was severely flawed, prejudicing the jury against him. He asserts that the prosecutor misstated the record on multiple occasions, invited an improper inference and vouched for a witness. Because he did not object to any portion of the closing at trial, however, his claims may be reviewed only for plain error. See United States v. DeCicco, 439 F.3d 36, 44 (1st Cir. 2006); Henderson, 320 F.3d at 105. Under the plain error standard, a defendant not only must show an error that was obvious and that affected substantial rights but also must persuade the court that the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 466-67 (1997) (internal quotation marks and multiple citations omitted); see also DeCicco, 439 F.3d at 44-45.

While the closing in this case was not perfect, Ortiz's claims fall short of the plain error threshold, which "'ordinarily [is] limited to "blockbusters" and does not consider "the ordinary backfires – whether or not harmful to a litigant's cause – which may mar a trial record."'" See Henderson, 320 F.3d at 105 (quoting United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987)). We address each of the asserted improprieties.

-14-

A. Factual misstatements/vouching.

1. Phone calls. Ortiz claims that the prosecutor incorrectly told the jury that Ortiz had spoken with Collazo "a couple of times" and made more than one call from his cell phone to the undercover buyers. Ortiz asserts that there was no evidence that he made multiple calls, and he terms the evidence of even one call "implausible." We need not tarry over this contention. As discussed earlier, Collazo's testimony and the transcript of the calls permitted an inference that Ortiz participated in two calls – an inference the government was free to argue in closing.

2. Drug quantity. Ortiz next argues that the record lacks support for the prosecutor's statement that Ortiz "agreed to transport $125,000 worth of cocaine in the trunk of his car." Although Ortiz is correct that the record does not show his knowledge of the quantity of cocaine in the blue bag, the prosecutor was entitled to argue that Ortiz had agreed to transport the cocaine that was found in his vehicle – an amount that turned out to be worth $125,000. To the extent the prosecutor's statement was at all misleading, it surely does not constitute plain error given that the finding of guilt did not depend on the exact amount of cocaine at issue.

3. Driver for drug deals. It is undisputed that the prosecutor misstated the evidence in arguing that Ortiz "admitted that he had

-15-

driven other people in the past to other drug deals."[2]  What Ortiz

in fact said was that he had given rides in the past to people he

believed were drug dealers – a statement significantly different

from admitting that he had driven them to deals, particularly since

the government claimed he had done precisely that in this case.

The prejudice attached to this misstatement cannot be denied,

but, in context, it does not rise to the level of plain error.

Ortiz's admission that he gave rides to known drug dealers

similarly supports an inference that he was familiar with drug

dealing and thus an unlikely innocent bystander in this deal.  The

reference comprised a brief portion of the closing argument, and

the district court instructed the jury that counsels' statements

are not evidence and that their own recollection must govern their

deliberations.  See United States v. Bey, 188 F.3d 1, 8-9 (1st Cir.

1999) (instruction that counsel arguments are not evidence found

"sufficient to cure any potential prejudice").  Moreover, there is

no assertion that the prosecutor deliberately misstated the

---

[2] The relevant portion of the government's closing argument
was the following:

> He [Ortiz] admitted that he had driven other people
> in the past to other drug deals.  Now, again, he
> conveniently forgets making that statement to Officer
> Gallarelli when Mr. Ortiz took the stand today, but he
> did say it that night.  He said it on the night of his
> arrest.  Please, members of the jury, if this defendant
> had done it in the past, had driven other people to drug
> deals, he surely knew what was going down on the night of
> February 13th, 2004.

evidence. In these circumstances, the prosecutor's misstatement was not even reversible error, let alone sufficient to scale the "high hurdle" of the plain error standard. See Henderson, 320 F.3d at 105; see also United States v. Villarman-Oviedo, 325 F.3d 1, 18 (1st Cir. 2003) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986)) ("'[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.'").

Ortiz additionally argues that the prosecutor improperly vouched for Gallarelli when, after she noted that Ortiz had "conveniently" forgotten telling the officer that he had driven other drug dealers, she continued: "but he did say it that night. He said it on the night of his arrest." In making that observation, the prosecutor was not, however, asserting her personal belief in the truthfulness of Gallarelli's testimony, but simply urging the jury to accept the officer's version of what occurred. This was permissible argument, not vouching. See United States v. Marshall, 109 F.3d 94, 100 (1st Cir. 1997) ("Not every factual recitation in the prosecutor's argument must start with a personal disclaimer.").

B. Invited improper inference.

Ortiz claims the prosecutor improperly invited the jury to infer that he was a knowing participant in the drug deal from the evidence that he possessed a small amount of drugs for personal

use.  We see no error in the government's use of this evidence.[3]

Ortiz admitted that the marijuana and cocaine found in his glove compartment belonged to him.  His possession of the drugs – and, inferentially, his prior knowledge of drug dealing – were relevant to his defense that he was an innocent bystander in Sosa's transaction.  In no way did the prosecutor invite the jury to find Ortiz guilty simply because his personal drug use demonstrated bad character that made him likely to commit the crime.  Rather, the prosecutor used his past experience with drugs to help establish that he "knew exactly what was going on that night."

We thus conclude that none of the asserted flaws in the prosecutor's closing argument warrant reversal of appellant's conviction.

## IV. Drug Quantity and Sentencing

An individual convicted of a possession offense involving at least five kilograms of cocaine is subject to a ten-year mandatory minimum term of imprisonment, see 21 U.S.C. § 841(b), and the penalty for a conspiracy to commit such a crime is the same as for

---

[3] The prosecutor made the following reference to the personal drug possession as part of her discussion about knowledge:

> Of course he knew what [Sosa] did for a living.  He admitted that he himself had drugs and he himself had drugs in his car, little packages of marijuana that Officer Gallarelli found, and the other little bag of cocaine that was found in the glove compartment . . . .

the substantive offense, see 21 U.S.C. § 846.[4]  In this case, the jury found that the crimes involved 5.02 kilograms, triggering the mandatory minimum.  Although the district judge acknowledged that the requisite ten-year sentence is "excessive in this case," she concluded that her hands were tied by the jury's factual finding.  She imposed a sentence of 121 months.

On appeal, Ortiz challenges that sentence in two ways.  First, he claims that the district court erroneously instructed the jury on drug quantity by failing to draw a distinction between the amount attributable to him in particular and the amount involved in the conspiracy as a whole.  Second, he argues that the district court itself improperly failed to make an individualized finding of drug quantity.

The issue of instructional error is easily resolved.[5]  Ortiz maintains that, on the conspiracy count, the court should have asked the jury to find the amount of cocaine specifically attributable to him – in addition to the total amount – because co-conspirators are held accountable only for the quantity reasonably foreseeable to them individually.  See United States v. Colon-

_____

[4] Conviction on a possession offense as an aider and abettor also results in the same penalty.  See 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").

[5] We note that no contemporaneous objections were made to the jury charge, but the standard of review is irrelevant here because, as we discuss, no error occurred.

<u>Solis</u>, 354 F.3d 101, 103 (1st Cir. 2004). Although Ortiz correctly describes the foreseeability limitation, our case law allows the particularized finding of drug quantity to be made by the court. <u>See</u> <u>United States</u> v. <u>Yeje-Cabrera</u>, 430 F.3d 1, 17 (1st Cir. 2005); <u>United States</u> v. <u>Derman</u>, 298 F.3d 34, 42-43 (1st Cir. 2002). The district court's charge, directing the jury to determine the quantity of cocaine involved in the conspiracy as a whole, was therefore proper.[6]

The court, however, also neglected to make a finding of its own on the quantity attributable to Ortiz on the conspiracy count.[7]

---

[6] In passing, Ortiz also argues that the court erred by failing to instruct the jury to determine the amount involved in each of the two charged crimes separately. Consistent with the charge, the jury form contained the following instruction:

> If you found defendant guilty on either Count One or Count Two, or both Counts, please answer the next question concerning amount.
>
> The amount of cocaine involved in one or both offenses is _____ grams.

The jury filled in the amount as 5020 grams (5.02 kilograms). The government admits the better practice would be to ask the jury to make separate quantity findings for each count. But in this case, where the alleged conspiracy was limited to the single transaction underlying the possession charge, combining them in the jury instruction was not error.

[7] Quantity is particularly significant in this case because the amount seized exceeds the threshold for a mandatory minimum sentence by only .02 grams. That small triggering amount – together with Ortiz's limited role and possible ignorance of the total quantity – likely accounts for the district court's sense that the mandatory term is "excessive."

No doubt, this oversight stems from the fact that the possession and conspiracy counts overlap with respect to drug quantity. In a typical conspiracy case, multiple transactions conducted by different co-conspirators may be deemed to comprise a single conspiracy, but, as we have noted, a co-conspirator may be held responsible for transactions in which he was uninvolved only if such transactions were foreseeable to him. A sentencing judge in such cases must explicitly determine which transactions are attributable to each defendant. See Colon-Solis, 354 F.3d at 103. Here, by contrast, both charges are based on the single attempted sale that occurred on February 13, 2004, in which Ortiz personally participated. The conspiracy amount and the individual amount thus coincided, and that amount was found by the jury.

Ortiz nonetheless asserts that the court should have addressed his individual responsibility and, in light of his limited role, should have concluded that it was not foreseeable to him that the gym bag Sosa placed in his car contained more than five kilograms of cocaine. Consequently, Ortiz argues, he should not be held accountable for the full quantity seized.

Such an argument clearly was foreclosed before the Supreme Court changed the status of the Sentencing Guidelines in United States v. Booker, 543 U.S. 220 (2005). Under the guidelines, the foreseeability inquiry applies only to the conduct of co-conspirators, and a defendant's ignorance of the particulars does

not affect his accountability on a substantive drug charge. See U.S.S.G. § 1B1.3(a)(1)(A) & comment. (n.2) ("The requirement of reasonable foreseeability applies only in respect to the conduct . . . of others . . . . It does not apply to conduct that the defendant personally undertakes, aids, abets . . . . or willfully causes . . . ."); comment. (n.2(a)(1)) ("a defendant who transports a suitcase knowing that it contains a controlled substance . . . is accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance"). Under the guidelines, then, Ortiz undisputedly was subject to the ten-year minimum term based on the jury's finding that he possessed, or aided and abetted the possession of, the 5.02 kilograms.

The guidelines, however, are no longer mandatory, Booker, 543 U.S. at 245, and we understand Ortiz to be arguing that the court now has the discretion, as well as the obligation, to consider foreseeability in circumstances such as these to assure that the sentence imposed is reasonable. See United States v. Alli, No. 05-1698, slip. op. at 11 (1st Cir. April 7, 2006) ("Sentences imposed under the advisory guidelines scheme . . . are subject to appellate review for reasonableness."). This argument works better for Ortiz in theory, however, than in application.

Although the guidelines are no longer decisive, Ortiz's sentence still must conform to the applicable statutory provision,

21 U.S.C. § 841(b), which specifically prescribes a ten-year minimum term for a violation "involving" five kilograms or more of cocaine. We see no basis for concluding that Ortiz's crimes "involved" some amount other than the 5.02 kilograms that the blue gym bag contained, and he cites no case in which a court, for sentencing purposes, discounted the drug quantity a defendant was found to have possessed (or aided someone else in possessing).

We understand Ortiz's reaction to this sentence. But like the district court, we cannot find legal authority to diverge from the statutory scheme and base his sentence on a drug weight different from that "involved" in the crime. And while the sentence may be severe, imposing responsibility for the whole amount is neither shocking nor indefensible in this case; given that the drugs were carried in a gym bag, it would not be unreasonable to infer that Ortiz knew the deal involved a good sized quantity.[8]

In sum, while the district court was not bound by the guidelines in determining a reasonable sentence, the statute of conviction does not leave open the possibility of a sentence based on a quantity of drugs less than that "involved" in the crimes that appellant committed. Accordingly, his sentence, as well as his convictions, must stand.

Affirmed.

---

[8] Ortiz testified that he saw Sosa put "a small gym bag" in his trunk.